THIRD DIVISION
October 15, 2008

No. 1-05-3260


| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02 CR 29731 |
| | ) | |
| BRIAN McCULLUM, | ) | Honorable Evelyn B. Clay, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |


PRESIDING JUSTICE MURPHY delivered the opinion of the court:

Following a bench trial, defendant, Brian McCullum, was found guilty of first degree murder but mentally ill (720 ILCS 5/9-1(a)(1), 6-2(c) (West 2004)) for the November 1, 2002, shooting death of Mario Davey. The victim was shot five times by defendant while working as a security guard at the White Castle restaurant located at 1550 East 79th Street, Chicago, Illinois. Defendant was sentenced to 45 years' imprisonment for first degree murder (730 ILCS 5/5-8-1(a)(1)(a) (West 2004)). This appeal followed the trial court's denial of defendant's posttrial motions.

Defendant does not dispute the trial court's finding that he shot the victim, but asserts several other issues on appeal. Defendant's primary contention is that the trial court's finding

1-05-3260

that defendant was mentally ill but not insane at the time of the murder was against the manifest weight of the evidence. Defendant also asserts that he was denied a fair trial by the misstatement of evidence during closing argument and the trial court's consideration of inadmissible evidence and incorrect facts. Defendant next contends that the State violated its obligation to provide the defense with a specific statement as to the substance of a rebuttal witness's testimony. Defendant argues that he suffered from ineffective assistance counsel related to the handling of the insanity issue. Defendant also contends that the trial court improperly found him fit to be sentenced and that he is entitled to one additional day of sentence credit. For the following reasons, we affirm the verdict of the trial court and order modification of the mittimus.

## I. BACKGROUND

Pursuant to a February 5, 2003, consolidated referral order of the trial court, defendant was evaluated by a psychiatrist with forensic clinical services of the circuit court of Cook County, Illinois (Forensic Clinical Services), to determine his sanity and fitness to stand trial. In an unsigned letter to the trial court, dated March 24, 2003, from Dr. Jonathan Kelly, a staff forensic psychiatrist, defendant was found fit to stand trial following an evaluation on March 18, 2003. Kelly indicated that defendant understood the nature and purpose of the legal proceedings and the consequences he faced and that he would be able to assist in his defense. Defendant informed Kelly that he was not receiving psychotropic medication, but he refused to give consent to allow Kelly to obtain his medication profile from Cermak Hospital. Kelly did not provide any opinion about sanity because defendant asserted his fifth amendment right and refused to discuss the shooting.

The trial court entered a second consolidated referral order on March 25, 2003, ordering

-2-

Forensic Clinical Services to evaluate defendant as to his fitness to stand trial with or without medication, his sanity, and his ability to understand *Miranda*. On April 30, 2003, Dr. Fidel Echevarria examined defendant to render a second opinion. Based on his clinical interview and review of medical records, Echevarria opined that defendant was unfit to stand trial and subject to involuntary hospitalization. Echevarria stated that defendant was unable to assist counsel due to his preoccupation with paranoid and persecutory delusions. Defendant continued to refuse to sign a release of information and Echevarria was unable to render an opinion as to sanity; however, given defendant's significant psychotic processing, poor insight and history of violence, Echevarria opined that defendant was subject to involuntary hospitalization.

Following yet another court order, Echevarria examined defendant again on August 29, 2003. On September 4, 2003, Echevarria opined that defendant was fit to stand trial with medication. Echevarria stated that he had yet to be provided defendant's medical and psychiatric records from around the time of the shooting and could not render an opinion as to defendant's sanity at that time. Following another examination on January 6, 2004, Echevarria issued another opinion letter on January 8, 2004, again opining that defendant was fit to stand trial with medication. Echevarria also opined that, based on defendant's psychiatric history of manifesting psychotic thought processing and behaviors and that he was noncompliant with medication treatment, he was legally insane at the time of the shooting.

Also, on January 8, 2004, the trial court entered a referral order for a second opinion on defendant's sanity. On May 3, 2004, Dr. Roni L. Seltzberg rendered her opinion regarding defendant's mental state at the time of the shooting. Based upon evaluations of defendant on February 13, 2004, and April 22, 2004, and a review of medical records, Seltzberg opined that defendant was legally insane at the time of the shooting as a result of an acute exacerbation of

defendant's schizophrenic disorder.

The State then sought a third opinion regarding defendant's sanity by a doctor of its choosing, Dr. Stafford Henry. The trial court denied the State's request, but then granted its motion to reconsider and allowed the State to proceed with a third opinion. Dr. Henry's opinion is not of record and he was not called as a witness.

At trial, the State presented testimony of several witnesses to detail the events that led to the fatal shooting of the victim and defendant's flight and capture. Two restaurant employees and two restaurant patrons testified to the events at the restaurant. Defendant arrived at the restaurant around 12:30 a.m. and someone bought him a coffee, which he had refilled several times. Defendant did not exhibit any odd behaviors until the shooting. Despite disheveled hair, defendant appeared well-kempt, and his clothes, a dark jacket and dark pants, were clean. Defendant quietly kept to himself and drank his coffee.

Shortly before the shooting, defendant stood near the soda machine and then walked to the second exit of the restaurant and stood looking outside for about five minutes. Defendant then walked toward the victim and pulled out and fired a handgun at the victim. The victim raised his hands in the air as the first shot missed him and hit a window and then tried to get his own gun out of his holster. Defendant moved closer to the victim and fired the handgun several more times from a distance of four or five feet from the victim. Defendant then quickly walked out of the restaurant and ran across the street, through a parking lot east toward Stony Island.

In addition to this testimony, video footage from the interior and exterior security cameras of the restaurant was published at trial. The footage corroborated the testimony outlined above. Defendant is shown waiting in line for coffee and sitting down at a table to drink his coffee between 3:35 a.m. and 3:45 a.m. While defendant sat, the victim moved in and out of the view

of the camera. At about 3:50 a.m. defendant got up from his seat, walked to the window and drank his coffee with his back to the counter. At about 3:54 a.m. defendant walked back across the restaurant toward the victim and shot the victim. Defendant then ran out of the restaurant, knocking a garbage can over as he exited. The footage from the outside camera showed defendant leaving the restaurant and running across the parking lot.

One of the witnesses drove off to find a squad car to report the shooting. Responding to a flash message of the shooting, responding officers saw defendant running eastbound on East 74th Street, toward Stony Island and holding his midsection. Defendant ran to a gated mosque and attempted to scale the fence when the police officers approached him, drew their weapons and ordered defendant to the ground. Defendant complied with the officers, but as he was handcuffed, a revolver fell from defendant's midsection to the ground. Defendant kicked the revolver underneath the fence and into the adjacent parking lot. Defendant appeared to understand the situation and who the officers were. The revolver was recovered from the parking lot and tested by the police.

Defendant presented the testimony of Dr. Seltzburg in his defense. Seltzberg testified that she saw defendant in 1998 upon a referral resulting from a misdemeanor assault charge. Seltzberg opined that defendant had a psychotic disorder and prescribed antipsychotic medication. Seltzberg next saw defendant on February 13, 2004, and April 22, 2004.

Seltzberg testified that prior to the evaluation on February 13, 2004, she reviewed numerous documents, including: defendant's medication profile that indicated he was prescribed antipsychotics; Dr. Echevarria's reports that indicated defendant was fit to stand trial with medication but legally insane at the time of the shooting; the police report of the shooting; comments from defendant's father that a gun had been stolen from his home, defendant had been

diagnosed with paranoid schizophrenia when he was discharged from the military in 1987, and that he was noncompliant with his medications; a report that defendant was discharged by the United States Marine Corps because of mental illness and was currently on disability; and the video surveillance footage from the restaurant. After the first evaluation in 2004, Seltzberg reviewed additional documents, including: Veterans Administration (VA) Hospital records from 1984 that indicated defendant was delusional and had auditory hallucinations and that defendant had been admitted to the hospital in 1993, 1996, and 1998; McNeal Hospital records indicating defendant was admitted in July 2001 and diagnosed with paranoid schizophrenia; additional records that indicated defendant was noncompliant with medications and had become religiously preoccupied; and emergency room records from August 2001 where defendant had been brought in for walking in the middle of the street, paranoid, delusional, and religiously preoccupied. Seltzberg testified that she also reviewed records from August and October 2002 that indicated defendant had been taking his medication and was doing well as late as October 24 and 28, 2002, when he was treated for a respiratory infection and hemorrhoids, but was not found certifiable by the VA psychiatrist.

Seltzberg also reviewed records from November 4, 2002, and February, March, and April 2003. These records indicated that defendant was exhibiting paranoid behavior and having auditory hallucinations. Treater impressions from this time period ranged from schizophrenia to major depressive disorder with psychotic features. Seltzberg indicated that one psychologist, likely a Dr. Mionette,[1] made a note that she felt that defendant could be malingering. Seltzberg

---

[1] The spelling of "Mionette" in the record was done phonetically in two different spellings and, for purposes of this opinion, we will utilize this spelling.

stated that this was likely based on presentation and not a diagnosis. This was not introduced into evidence as an opinion and Dr. Mionette did not testify. Defendant was sent to the general hospital population initially, though he was later administered antipsychotic medications and continued to complain of auditory hallucinations. The records from 2003 indicated that defendant had refused to take his medications, threatened others, required restraints and was eventually forcibly administered medications.

Seltzberg testified that during her February 2004 evaluation, defendant claimed that he was given a shot of poison by the military. Seltzberg opined that defendant was not compliant with his medications because he did not have a good insight regarding his illness. In April 2004, defendant told Seltzberg that he had not been taking his medication at the time of the shooting because it made him drowsy. Seltzberg testified that defendant said he felt threatened by a man with a tattoo so he climbed through a window of his father's house to steal his father's revolver for protection.

Defendant said that he stopped at the White Castle on the night of the shooting on his way to a meeting at the mosque. Defendant claimed that he had never been to the restaurant before despite the police report noting that he had recently been kicked out of the restaurant. Defendant told Seltzberg that he felt sleepy even though he was drinking coffee and that he saw signaling between the victim and the restaurant employees. Thinking they had put something in his coffee, defendant said he felt threatened, shot the victim in the head and ran to the mosque.

Seltzberg testified that she diagnosed defendant with schizophrenic chronic paranoid type and concluded that he was legally insane at the time of the shooting. She based her opinion on the evidence of schizophrenia that he was acutely psychotic at the time, and his prior history of

violent behavior. Also, important to her diagnosis was defendant's lack of motive. Seltzberg testified that her opinion would not change even if she were informed that defendant had been punched by the security guard who kicked him off the property.

Seltzberg testified that she found no evidence of malingering, instead finding that defendant attempted to minimize or deny any psychotic behavior. Seltzberg testified that even though defendant was symptomatic and delusional at the time of the shooting, his behavior would not necessarily have been bizarre or erratic and agreed that he appeared to be acting normally on the security video.

On rebuttal, the State presented the testimony of Melvin Mickens, a City of Chicago police officer who also worked as a security guard, and Larry McCullum, defendant's father. Mickens testified that on October 28, 2002, he worked as a security guard at the White Castle from 10:00 p.m. to 6:00 a.m. Mickens testified that when he arrived that night he told defendant he could not beg for money by the entrance and that he would have to leave. A few minutes later, Mickens saw that defendant had remained by the entrance so he went outside and punched defendant in the face, grabbed him by the throat and slammed his head against the brick wall. Defendant then left the area.

Mickens admitted that he did not record this incident in writing or inform the assistant State's Attorney about the incident until a couple months before trial. Mickens testified that he did inform the investigating detectives that he saw defendant at the restaurant on October 28, 2002, and asked him to leave because he was begging for money. Mickens did not inform the detectives that he had punched defendant.

Defendant's father testified that the gun in evidence looked like his gun. He testified that

on October 28, 2002, defendant had entered his home while he was at church. After he learned that defendant might have stolen his gun, he noticed that his gun was missing.

Following closing arguments, the trial court entered its verdict of guilty but mentally ill. The trial court specifically found: that Seltzberg testified that defendant was in remission in August 2002 and taking his medication; that defendant went to the emergency room on October 24, 2002, and a psychiatrist found him not certifiable; that defendant was again treated at the hospital on October 28, 2002, and there was no indication of psychiatric disorder or illness at that time; and that on November 4, 2002, defendant was diagnosed with a major depressive disorder with psychiatric features and that he was malingering. The trial court found that the close proximity of these dates to the incident and the evidence at trial indicated that defendant was not insane at the time.

The trial court found that the evidence indicated that defendant planned the shooting in revenge. The trial court stated that Mickens beat defendant and kicked him off the property. In response, defendant broke into his father's home and stole his father's revolver. Days later, defendant armed himself with the revolver, returned to the restaurant and waited quietly for an opportunity to shoot the victim. The trial court noted that the security video and testimony showed that before the shooting defendant got up, walked around the restaurant and looked out the vestibule and exit. Furthermore, the trial court noted that defendant immediately fled after the shooting and as he was apprehended, kicked the gun away from the police.

Defendant filed several posttrial motions to vacate the trial court's finding of guilty but mentally ill and for a new trial. Defendant also argued that Mickens' inconsistent testimony did not support the verdict. The trial court denied defendant's argument that the verdict was against

the manifest weight of the evidence.

Defendant also filed a motion to vacate the verdict based on newly discovered evidence. Defense counsel was informed after trial that defendant was hospitalized on October 28, 2002, With his motion, defendant submitted copies of a medical record and "EMS" report that indicated defendant was transported via ambulance to St. James Hospital in Chicago Heights, Illinois, at 9:59 p.m. and admitted to the hospital at 10:33 p.m. on that date. Accordingly, defendant argued that this showed that he was not at the restaurant at the time that Mickens claimed and that no motive existed as the State argued. The trial court denied the motion, finding that the State overwhelmingly proved its case.

At defendant's sentencing hearing, the trial court heard further argument on defendant's motion for a new trial. Defense counsel attempted to argue that Dr. Henry, the State's own doctor requested for a third opinion on sanity, also opined that defendant was legally insane at the time of the shooting. The trial court stated that this evidence was not presented at trial and upheld its denial of defendant's motion. Following argument on aggravation and mitigation, defendant spoke to the trial court. Defendant made a long speech that included claims that he was injected with a mind-altering substance by the Marine Corps, he never had contact with Mickens, and he believed that drugs had been added to his coffee on the night of the shooting. Defendant received a sentence of 45 years' imprisonment for first degree murder with 1,049 days' credit for time served. Defendant does not dispute that he shot and killed the victim, but now appeals his conviction sentence.

## II. ANALYSIS

### A. Determination of Sanity

Defendant argues that the trial court erred in finding that he was mentally ill but not insane at the time of the shooting. In Illinois, a person is not criminally responsible for conduct if, at the time of the conduct, he suffered from mental disease or defect, such that he lacked substantial capacity to appreciate the criminality of that conduct. 720 ILCS 5/6-2(a) (West 2004). Where a defendant raises the affirmative defense of insanity, he bears the burden of proving by clear and convincing evidence that he is not guilty by reason of insanity, while the State retains the burden of proving guilt beyond a reasonable doubt. 720 ILCS 5/6-2(e) (West 2004). Where a defendant fails to prove his insanity but has proven that he is mentally ill and the State has proven his guilt beyond a reasonable doubt, the trial court may find the defendant guilty but mentally ill. 725 ILCS 5/115-3(c) (West 2004).

The questions of a defendant's sanity and mental illness are questions of fact, and the fact finder's resolution of these questions will not be disturbed unless contrary to the manifest weight of the evidence. *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007), citing *People v. Johnson*, 146 Ill. 2d 109, 128-29 (1991). As the defendant bears the burden of proof, the State does not need to present expert testimony on the issue of sanity but may rely purely on facts in evidence and the inferences that follow from those facts. *People v. Gilmore*, 273 Ill. App. 3d 996, 1000 (1995). Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane. *Gilmore*, 273 Ill. App. 3d at 1000.

It is the function of the trier of fact to assess the credibility of witnesses, the weight given to their testimony, and the inferences to be drawn from the evidence. *People v. Cox*, 377 Ill. App. 3d 690, 697 (2007). The trier of fact is in the best position to view a witness while he or she is being questioned and may believe as much, or as little, of any witness's testimony as it

sees fit. *People v. Mejia*, 247 Ill. App. 3d 55, 62 (1993). This rule also applies to expert opinions on sanity, and the weight of such an opinion is to be determined by the reasons given and the facts supporting the opinion. *People v. West*, 231 Ill. App. 3d 646, 650 (1992). Expert testimony may be entirely rejected by the trier of fact if he or she concludes a defendant was sane based on factors such as: whether lay testimony is based on observations made shortly before or after the crime; the existence of a plan for the crime; and methods undertaken by the defendant to prevent detection. *West*, 231 Ill. App. 3d at 651.

In this case, defendant's argument, which the dissent adopts, is that the trial court's decision to ignore the uncontroverted expert opinions of Drs. Seltzberg and Echevarria was against the manifest weight of the evidence. Defendant argues that the inconsistent and impeached testimony of Mickens further supports reversal because the trial court specifically relied on this testimony in finding that defendant acted in revenge. Defendant asserts that when this improper evidence is removed, the only evidence remaining is wholly consistent with Seltzberg's opinion that defendant was insane and that he acted in line with his insane delusions.

As our case law outlined above makes clear, the trial court is the fact finder, that must determine the credibility of witnesses and assess the weight afforded to their testimony and the evidence at trial. For reversal, it is not sufficient that there is evidence to support defendant's argument or even that, were we the trier of fact, we would have found clear and convincing proof of insanity. The standard by which we must review the trial court's denial of defendant's affirmative defense is whether its decision was against the manifest weight of the evidence. We will not substitute our judgment for the trial court's regarding the weight of the evidence, the credibility of the witnesses, or the inferences to be drawn from the evidence.

We agree with the State that *Gilmore* and *West* are instructive. In *Gilmore*, the defendant was found in the basement of a home she had broken into alongside property she had stolen from the house. Upon discovery, the resident searched his house for an intruder and then boarded up the window that the defendant had broken to enter the basement. When he later found the defendant, she was lying under a blanket in the basement near the broken window. The resident took the defendant upstairs and called the police, and when he asked the defendant why she broke in, she responded that she was homeless and had nowhere else to go. *Gilmore*, 273 Ill. App. 3d at 997-98.

At trial, the defendant presented the testimony of two doctors who opined that she was legally insane at the time of the burglary. One psychiatrist examined the defendant on two occasions while the other doctor examined defendant only once. All of these evaluations were conducted several months after the incident. Both psychiatrists reviewed the defendant's psychiatric records and the police report of the incident. *Gilmore*, 273 Ill. App. 3d at 998-1000.

Weighing the expert opinions, the lay testimony and evidence, the trial court found defendant sane but mentally ill. The trial court opined that the lay testimony and circumstances of the case refuted the opinions of the psychiatrists. The trial court reasoned that neither doctor could substantiate his or her basis for finding that the defendant was not malingering. The doctors also failed to address that one basis for their insanity opinion, that the defendant did not flee, was foreclosed by the resident's boarding of the broken window. The defendant's lack of delusional response to the resident's query after being caught was also cited as support for a finding of guilty but mentally ill. *Gilmore*, 273 Ill. App. 3d at 1000. This court affirmed the trial court, holding that, upon these facts, the trial court's finding was not against the manifest weight

of the evidence. *Gilmore*, 273 Ill. App. 3d at 1001.

In *West*, the defendant was found guilty but mentally ill on charges of attempted aggravated criminal sexual assault, attempted criminal sexual assault, aggravated kidnapping and aggravated battery. *West*, 231 Ill. App. 3d at 647. The trial court in *West* also came to this finding over the opinions of two psychiatrists who evaluated the defendant several months after the incident and found him legally insane at the time of the incident. *West*, 231 Ill. App. 3d at 648-50. The trial court found that the testimony of the victim, a witness and the arresting police officer indicated that the defendant had a plan to assault the victim, took her to a secluded area to prevent detection and fled when the victim was able to scream for help. Furthermore, each of the witnesses testified that the defendant appeared normal, coherent and remorseful before, during, and after the attack. *West*, 231 Ill. App. 3d at 651.

Despite defendant's protestations that Mickens' testimony and the evidence supporting the alleged motive was either improper or incredible, the trial court based its decision primarily on the testimony and evidence of defendant's condition immediately surrounding the shooting. The trial court concluded that this evidence outweighed Seltzberg's opinion, which was formulated 15 to 17 months after the shooting. The trial court stated that the evidence provided further support for its conclusion that the medical records indicated defendant was sane as it showed that defendant contemplated and planned the shooting in revenge.

In support, the trial court noted that despite living in a shelter at the time, defendant returned to the White Castle that he had been kicked out of and where Mickens had beaten him. Defendant had broken into his father's home, stole his father's revolver, and returned to the White Castle. The trial court noted that the security video and testimony showed that defendant

waited quietly for an opportunity to shoot the victim. Before the shooting, defendant got up, walked around the restaurant and looked out the vestibule and exit. Furthermore, the trial court noted that defendant immediately fled after the shooting and kicked the gun away from the police as he was apprehended.

It is true, as defendant contends, that these facts do not evidence meaningful interactions between the witnesses and defendant as in *Gilmore* and *West*. Defendant also notes that, unlike in *West*, in this case there was no evidence that defendant was read his *Miranda* rights or that he understood his rights. It is also true that defendant did shoot the victim in plain sight unlike the defendant in *West* who took his victim into a secluded area to conceal the crime. However, the facts of this case are more applicable to these cases than defendant maintains.

The testimony of the restaurant employees and patrons, in addition to the security video footage, gave the trial court several corroborating impressions of defendant's behavior. While there was no real interaction prior to the shooting, the witnesses recalled defendant's behavior for a long period of time and the police officers testified that when he was arrested, defendant appeared to understand the situation. Further, defendant attempted to conceal his involvement in the crime by kicking the revolver under the fence away from the arresting officers.

What is more important, and what makes this case stronger for the State than those in *Gilmore* and *West*, are the medical records in evidence from defendant's care both before and after the incident. As noted above, Seltzberg testified that defendant was in remission in August 2002 and taking his medication. The evidence showed that defendant went to the emergency room on October 24, 2002, and a psychiatrist found him not certifiable. He was at the hospital again on October 28, 2002, and there was no indication of psychiatric disorder or illness at that

time. Finally, after the shooting, on November 4, 2002, defendant was diagnosed with a major depressive disorder with psychiatric features. There also was an indication that he might be malingering and was placed in the general hospital population. The trial court found that the close proximity of these dates to the incident and the evidence at trial indicated that defendant was not insane at the time.

There is no dispute that defendant is mentally ill and had been diagnosed with mental illness well before the shooting. In fact, this case is admittedly close and difficult as there was support at trial that a finding that defendant was legally insane at the time of the shooting would be reasonable. However, that is not the question that we must answer. There also was support for a finding of guilty but mentally ill. Like in *Gilmore* and *West*, the medical experts examined defendant several months after the incident and several witnesses testified to defendant's behavior and actions. Furthermore, unlike *Gilmore* and *West*, in this case there also was significant medical documentation of defendant's mental and physical state leading up to, and immediately after, the shooting. We cannot say that the trial court's holding was unreasonable, arbitrary or unsupported by the evidence. Accordingly, we affirm the trial court's denial of defendant's affirmative defense.

### B. Right to a Fair Trial

Defendant next argues that he was denied his right to a fair trial because of prosecutorial misconduct and the trial court's use of inadmissible evidence and erroneous conclusions in finding that defendant was sane at the time of the shooting. Defendant asserts that the State argued, without evidentiary basis, that defendant was "gaming" the system, that a doctor opined defendant was malingering, and that the State misstated the evidence to argue that defendant

acted in revenge. Defendant claims that the trial court then rested its opinion on this inadmissible evidence and improper conclusions, also resulting in a violation to his right to a fair trial.

The State argues that the failure to make a timely objection and renew it in a posttrial motion operates as a waiver of the right to argue that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 187 (1988). The State asserts that both of these issues were waived for purposes of review as defendant failed to preserve them. Defendant admits that these issues were not properly preserved. However, defendant asserts that this court should review these issues as plain error pursuant to Illinois Supreme Court Rule 615(a). 134 Ill. 2d R. 615(a). Nonpreserved errors may be reviewed on appeal if the evidence is closely balanced or where the errors are of such a magnitude that defendant was denied a fair and impartial trial and remedying the error is required to preserve the integrity of the judicial process. *People v. Johnson*, 208 Ill. 2d 53, 64 (2004). Because the evidence was close and defendant's allegations implicate the constitutional protections of a fair trial and a right to confront witnesses, we consider each issue under plain error review.

### 1. *Prosecutorial Misconduct*

In reviewing allegations of prosecutorial misconduct, this court must consider the arguments of both the prosecutor and the defense in their entirety and place the allegations of improper comments in context. *People v. Evans*, 209 Ill. 2d 194, 225-26 (2004). The prosecution has the right to comment on the evidence presented at trial and draw all reasonable inferences deducible therefrom. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). The prosecution may also respond to comments made by defense counsel. *People v. Abadia*, 328 Ill. App. 3d

669, 678 (2001). It is well settled that prosecutors enjoy wide latitude in closing arguments and that the scope of permissible argument rests within the sound discretion of the trial court. *People v. Griffin*, 368 Ill. App. 3d 369, 376 (2006). Any improper comments or remarks made by a prosecutor in closing arguments are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. *People v. Sutton*, 316 Ill. App. 3d 874, 893 (2000).

Defendant argues that, faced with no expert testimony to counter the opinion of Dr. Seltzberg, the State misstated the evidence to try and discredit her opinion. Defendant contends that the State argued, without evidentiary basis, that: defendant was experienced at "gaming" the system; Dr. Mionette, who saw defendant just days after the shooting, opined that he was malingering, and defendant returned to the restaurant after stealing the gun in response to being beaten by Mickens. Defendant argues that the trial court's findings demonstrate that it accepted these unsupported claims as facts and he was denied a fair trial as a result. Defendant concludes that the State's cavalier attitude toward these representations is especially inappropriate in light of the recent line of cases where our supreme court has reaffirmed its "intolerance of prosecutorial misconduct." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007); see also *People v. Johnson*, 208 Ill. 2d 53 (2003); *People v. Nelson*, 193 Ill. 2d 216 (2000); *People v. Blue*, 189 Ill. 2d 99 (2000).

We are certainly mindful of these cases and note that this court has also expressed serious concerns with the aggressive and cavalier attitude that some prosecutors deem necessary to adopt. While we agree the State's presentation of its case was deficient in some areas, the behavior of the prosecutor in this case did not rise to the level of a persistent and pervasive

pattern of misconduct so egregious to warrant a new trial as exhibited in the line of cases above. The trial court heard all of the testimony and reviewed the evidence. The trial court therefore was able to assign weight to testimony as it saw fit, and we operate under the rebuttable presumption that the trial court relies only on proper argument and evidence in making its decision. *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977).

Based on the entire record and the trial court's holding, the prosecutor's argument did not exceed the bounds of proper argument. First, the State's comment that defendant was "gaming" the system was brief and not repeated. Further, the trial court did not cite this argument as support for finding defendant legally sane.

With respect to the trial court's statement that the medical records reviewed by Seltzberg included a "finding" by Dr. Mionette that defendant was malingering on November 4, 2002, defendant claims that Seltzberg only testified that defendant was not diagnosed with malingering but that it was based on presentation. Seltzberg continued that defendant minimizes any psychotic disorders, but he may have been acutely psychotic on November 4, 2002, because he did not minimize his symptoms. The State then sought clarification and asked whether Dr. Mionette indicated that defendant was malingering and Seltzberg responded:

> "DR. SELTZBERG: I can only answer that by saying anyone that might have seen him initially might probably would not have had his records, and he might have seen him initially might probably would not have had his records, and he might not have described what his history was, so the suggestion or the impressions or diagnosis of malingering, you would base only on the initial presentation and the doctor's initial thoughts just maybe."

Seltzberg testified that she was not present for these evaluations and that she did not know what records were reviewed. Seltzberg added that she was uncertain if it was Dr. Mionette that made that notation. Whether or not it was Mionette or another doctor, Seltzberg's testimony supports an inference that a doctor made a "finding" that defendant was malingering. The State argued that Dr. Mionette said defendant was malingering and the trial court noted that Mionette made a "finding" that defendant was malingering. There was not an improper argument that this was a definitive diagnosis, just that, in addition to the other medial records from around the time of the shooting, this finding or statement, whatever term is applied, supported the conclusion that defendant was legally sane at the time of the shooting.

Defendant finally argues that the inferences argued by the State regarding the gun that defendant stole from his father and Mickens' testimony are clearly wrong based on opposite inferences. While the dates from testimony and evidence do not align, especially considering the newly discovered evidence of defendant's ambulance transport and treatment, the trial court heard the testimony of the witnesses and was able to assign weight to each piece of evidence. The State argued the testimony presented at trial. Importantly, the trial court specifically held, and reiterated during posttrial proceedings, that it found defendant sane at the time of the shooting based on the medical records from immediately before and after the shooting. Accordingly, even if these comments were in error, they were not a material factor in the trial court's holding and defendant did not suffer substantial prejudice.

2. *Trial Court's Use of Inadmissible Evidence and Erroneous Conclusions*

Defendant's second argument that his right to a fair trial was violated follows from above. Defendant contends that the trial court rejected Seltzberg's opinion because it found there was no

indication that defendant was experiencing acute psychiatric impairment around the time of the shooting and that defendant had planned the shooting to exact revenge for the beating. Defendant asserts that these conclusions were based on inadmissible evidence or were contrary to the evidence.

Defendant argues that the trial court's conclusions that defendant was not symptomatic at the time of the shooting were based on faulty readings of the medical records from October and November 2002. The trial court concluded that the fact that the psychiatric hospital evaluated defendant on October 24, 2002, and he was deemed not certifiable was evidence of his sanity. Defendant maintains that the simple fact that he was sent for a psychiatric evaluation when seeking treatment of a respiratory infection requires a conclusion that he was symptomatic. Further he argues that the fact he was not certifiable only shows that he was not an imminent danger to himself or others and was not proof of his sanity. Likewise, the failure to note any psychotic presentation during his treatment for hemorrhoids on October 28, 2002, also is unreasonable to support a sanity finding.

Finally, defendant argues that the trial court's citation to the malingering finding by Dr. Mionette was inappropriate because it was hearsay and inadmissible. Seltzberg testified that the medical records she reviewed, and relied upon, indicated that a finding was made that defendant might be malingering. The trial court recounted details from the records from each of these dates to reject Seltzberg's opinion. The records were not substantive evidence, but were testified to by Seltzberg in how she formed her opinion. With respect to the records from before the shooting, the record does not indicate why defendant was evaluated by the psychiatric department or whether it was routine because of his medical history. The fact remains that he was found not

certifiable and that no notation of any presentation of mental illness was made in these records. We agree that the evidence was closely balanced, but that does not lead to the conclusion that the trial court was clearly erroneous in making its conclusions.

Defendant also argues that the trial court erred in determining that defendant planned the shooting, because there were inconsistencies in Mickens' testimony and the State failed to prove when the gun was actually stolen. As we have noted above, the trial court rested its opinion on the medical records and only cited to the other evidence as additional support for its finding. We also have noted that there were holes in this string of evidence provided; however, that does not require reversal in this case as the trial court did not rest on this evidence. Furthermore, as the trial court stated in posttrial proceedings, the timeline was irrelevant as the fact would remain that defendant stole the gun, the trial court found that defendant was kicked off the restaurant property, and defendant subsequently returned to the restaurant with the gun and methodically shot the victim. While the facts as originally presented are stronger than this version, it cannot be said that the trial court rested on these erroneous facts.

### C. State's Disclosure of Rebuttal Witness Testimony

Defendant next contends that the State violated its obligation under Supreme Court Rule 412(a) to provide the defense with a specific statement as to the substance of the testimony that Melvin Mickens was to provide in rebuttal. 188 Ill. 2d R. 412(a). Defendant argues that the testimony by Mickens was a total surprise to defense counsel and that he was prejudiced because it was an integral factor in the trial court's reasoning. The State responds, and we agree, that defendant waived this issue.

The State again argues, and defendant admits, that this issue was not objected to at trial,

no continuance was sought to investigate Mickens, and the issue was not raised in his posttrial motion. We agree with the State that defendant waived this issue at trial. However, defendant asserts that this issue should also be reviewed as plain error pursuant to Illinois Supreme Court Rule 615(a). 134 Ill. 2d R. 615(a).

While we disagree with the State's assertion that it did not violate Rule 412(a), we agree that defendant has failed to show that his right to a fair trial was prejudiced by the error. *People v. Galindo*, 95 Ill. App. 3d 927, 932-33 (1981). Despite the State's reading of Rule 412(a), the plain language of the rule requires the State to disclose the identity of rebuttal witnesses and a specific statement as to the substance of the testimony of the witnesses. 188 Ill. 2d R. 412(a). Case law recognizes that the identity or specific testimony of rebuttal witnesses may not be known until a defendant presents his case, and, therefore, the proper procedure is for the State to provide this information when the intention is formed. This requirement properly serves the goal of discovery to eliminate surprises and unfairness and afford an opposing party the opportunity to investigate. *Galindo*, 95 Ill. App. 3d at 932. Whether a discovery violation warrants mandate for a new trial depends on the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice could have helped the defense discredit the evidence. *People v. Weaver*, 92 Ill. 2d 545, 560 (1982).

In this case, Mickens was properly disclosed as a potential witness by the State pursuant to Rule 412. The record indicates that a supplemental police report was presented and defendant was aware of this report. The report indicated Mickens had stated that he had ordered a person, who may have been defendant, to leave the entrance of the White Castle on October 28, 2002; however, there was no information regarding any beating or force used against defendant. There

was no further disclosure concerning rebuttal witnesses.

This clearly violates the goal of discovery to eliminate surprises and unfairness. However, the goal of affording an opportunity to investigate was served, as the State argues, by the disclosure of Mickens as a possible witness and the supplemental police report that indicated he may have kicked defendant out of the White Castle three days before the shooting. Furthermore, defense counsel could have sought a continuance when Mickens was presented to fully investigate him and his possible testimony.

More important, as the State points out, the trial court considered this argument when raised within defendant's argument based on newly discovered evidence. The trial court reiterated that it based its determination of defendant's sanity on the medical reports directly surrounding the incident and the testimony and video evidence provided regarding the shooting. The trial court stated that Mickens' testimony went to motive and it was immaterial to the finding of sanity. As described above, the trial court finding was not against the manifest weight of the evidence and whether Mickens' testimony was excluded or discredited would not alter the sanity determination. Accordingly, defendant has not shown prejudice and a new trial is not warranted.

### D. Ineffective Assistance of Counsel

Next, defendant asserts that he suffered from ineffective assistance of trial counsel. Defendant argues that defense counsel was ineffective for her failure to present additional evidence of defendant's legal insanity and for her failure to impeach Mickens. In addition, defendant argues that defense counsel failed to notice that the trial court and the State both inferred, contrary to the evidence, that defendant stole the gun before the alleged beating.

On appeal, this court reviews such claims under the two-pronged test set forth in

*Strickland v. Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068 (1984), which our supreme court recognized in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Under *Strickland*, to determine whether there has been a violation of the defendant's sixth amendment right to effective assistance of counsel, the defendant must show: (1) that his counsel's "representation fell below an objective standard of reasonableness"; and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Shatner*, 174 Ill. 2d 133, 144 (1996). If such a claim can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not consider the first prong. *People v. Pacheco*, 281 Ill. App. 3d 179, 183 (1996), citing *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991).

Trial counsel has the right to make ultimate decisions with respect to trial strategy and tactics and these decisions are ordinarily not reviewable. *People v. Adams*, 338 Ill. App. 3d 471, 477 (2003). If we do review an attorney's actions, we must show great deference to the attorney's decisions as there is a strong presumption that an attorney has acted adequately. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. A defendant is entitled to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994). The fact that an attorney undertook poor strategy or that another attorney would have handled the situation differently does not in itself render the representation ineffective or inadequate. *Palmer*, 162 Ill. 2d at 476.

As we noted above, and the dissent has also ably covered, defense counsel presented a quality case on behalf of defendant. We held above that, based on a review of the medical

history immediately surrounding the shooting, a reasonable person could conclude that defendant was sane at the time of the shooting. An additional expert who reviewed the same evidence and also evaluated defendant over a year after the shooting occurred would not overcome the trial court's findings. Furthermore, as stated above, the trial court did not rest its opinion on Mickens' testimony or any alleged inference contrary to the evidence. The trial court reiterated this in denying defendant's motion to reconsider. Accordingly, while counsel may have committed some errors in trial strategy or tactics, it cannot be said that defendant suffered sufficient prejudice that the result of the proceeding would have been different and we deny his claim of ineffective assistance of counsel.

### E. Defendant's Fitness for Sentencing

Defendant argues that the trial court erred in finding defendant fit to be sentenced and, despite the failure to object at trial or raise the issue in a posttrial issue, this court should review this issue as plain error. See 134 Ill. 2d R. 615(a). Defendant contends that his rambling 11-page monologue during his sentencing hearing presented a *bona fide* issue of his fitness for sentencing. He contends that when a *bona fide* issue of fitness exists, the trial court has a duty to hold a fitness hearing. *People v. Guttierez*, 271 Ill. App. 3d 301, 304 (1995).

Fitness for trial is a fundamental right; therefore, when this issue is waived as in this case, review under the plain error doctrine is proper. *People v. Meyers*, 367 Ill. App. 3d 402, 409 (2006). While the trial court has a duty to order a fitness hearing if it determines a *bona fide* issue of fitness exists, that determination rests within the discretion of the trial court. *Meyers*, 367 Ill. App. 3d at 409. If a reviewing court determines the trial court has made an error on this issue, it may, only upon a review of the entire record, determine that the error was harmless

beyond a reasonable doubt. *People v. Contorno*, 322 Ill. App. 3d 177, 180 (2001).

We agree with the State that no error occurred in this case and, even if such an error had occurred, it was harmless beyond a reasonable doubt. As detailed above, defendant underwent numerous evaluations to determine his fitness for trial, ultimately resulting in a finding that he was fit for trial with medication in February 2004. The trial was completed in November 2004 and the sentencing hearing was conducted in September 2005.

Defense counsel did not request another fitness hearing or raise this concern before sentencing. Defense counsel reiterated defendant's request to be found innocent by reason of insanity after his 11-page monologue and argued that his "speech speaks for itself" and asked for leniency. The factors relevant to whether this constitutes a *bona fide* doubt as to defendants fitness are (1) the defendant's demeanor and rationality at trial; (2) counsel's statements concerning defendant's competence; and (3) any prior medical determinations of fitness. *People v. Hanson*, 212 Ill. 2d 212, 223 (2004).

The record indicates that, for the first issue, only the rationality of portions of defendant's speech during the sentencing hearing are in question. Defendant's statement was rambling and fell into areas of what appear to be delusional thoughts. While it could be considered a sign that he lacked fitness, it also could be viewed as in line with the trial court's early finding that he was guilty but mentally ill. For the second factor, defense counsel did not raise any new concerns during the hearing, but stood only on defendant's statement as proof itself that he was not sane. Finally, the prior medical opinion presented before trial found defendant fit with medication. It cannot be said that the trial court abused its discretion in determining defendant's sentence and not ordering a new fitness hearing.

Furthermore, as noted by the State, the trial court considered all aggravating and mitigating factors and handed down the minimum sentence. In fact, the trial court noted defendant's mental illness and hope of rehabilitation as mitigating factors. Accordingly, any alleged error would be harmless as defendant could not achieve a better result than the minimum sentence.

## F. Sentence Credit

Finally, defendant argues, and the State concedes, that the mittimus incorrectly states that defendant is entitled to 1,049 days' credit for time served as of September 16, 2005. The correct calculation was that defendant was entitled to 1,050 days. This court has the authority pursuant to Supreme Court Rule 615(b)(1) to directly order the clerk of the circuit court to make the necessary corrections to the mittimus. 134 Ill. 2d R. 615(b)(1); *People v. Williams*, 368 Ill. App. 3d 616, 626 (2006). Accordingly, this court directs the clerk to amend the mittimus to reflect 1,050 days' credit for time served as of September 16, 2005.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court. The mittimus shall be corrected to reflect 1,050 days' credit for time served by defendant as of September 16, 2005.

Affirmed, and mittimus corrected.

CAMPBELL, J., concurs.

JUSTICE NEVILLE, dissenting:

The State's evidence established that defendant fatally shot the victim. The defendant's psychiatrists testified and opined, one during the pretrial proceedings and the other during the trial, that the defendant was insane at the time of the shooting and that he lacked substantial capacity to appreciate the criminality of his actions. The State did not present a psychiatrist or any other evidence, during its case in chief or its rebuttal, that rebutted the defendant's evidence of insanity; therefore, the defendant proved by clear and convincing evidence that he was insane at the time of the murder. Accordingly, I respectfully dissent because the defendant proved that he was insane at the time of the murder.

THE PRETRIAL PROCEEDINGS

In order to determine if the trial court's finding, that the defendant was not insane (did not appreciate the criminality of his conduct) at the time of the murder but was guilty and suffering from a mental illness (did appreciate the criminality of his conduct), was against the manifest weight of the evidence, we must examine the evidence introduced at the trial. On May 2, 2003, Dr. Fidel Echevarria, a staff psychiatrist from Forensic Clinical Services,[2] opined that the defendant was unfit to stand trial and that the defendant was suffering from significant psychotic processing and was subject to involuntary hospitalization. The trial court relied on Dr. Echevarria's first unfitness

---

[2] Forensic Clinical Services is one of the circuit court of Cook County's 13 non-judicial offices. It (1) provides comprehensive and diagnostic clinical services to the court and related agencies under the court's jurisdiction, (2) employs psychiatric, psychological and social service methods in the delivery of clinical services, (3) submits clinical opinions and recommendations to the court, and (4) provides expert witness testimony where mandated.

opinion. On September 4, 2003, Dr. Echevarria opined that the defendant was fit to stand trial with medication. The trial court relied on Dr. Echevarria's second fitness opinion and found the defendant fit to stand trial with medication.

On January 8, 2004, Dr. Echevarria opined that the defendant was legally insane at the time of the alleged offense. The opinion was based on "the documented evidence that the defendant was manifesting psychotic thought processing and behaviors at about the time of his arrest." Dr. Echevarria further opined that, given the defendant's "psychiatric history and the fact that the defendant was noncompliant with medication treatment, it is more likely than not that at the time of the alleged incident, the defendant would not have had capacity to appreciate the criminality of his alleged actions due to the presence of psychotic thoughts which directed his behavior." Finally, the trial court refused to rely on Dr. Echevarria's opinion that the defendant was insane at the time of the offense.

The State asked the trial court for a second opinion, and the judge ordered Forensic Clinical Services to reexamine the defendant and express an opinion on his sanity at the time of the offense. On May 3, 2004, Dr. Roni Seltzberg, a staff psychiatrist from Forensic Clinical Services, opined that the defendant was legally insane at the time of the alleged offense.

After Dr. Echevarria and Dr. Seltzberg opined that the defendant was insane at the time of the offense, the State requested that Dr. Henry, the third psychiatrist from Forensic Clinical Services, evaluate the defendant's sanity at the time of the offense. The trial court granted the State's request, but the doctor never testified at the trial.[3]

---

[3] At sentencing, defendant's counsel stated that Dr. Henry opined that the defendant was insane at the time of the offense.

THE STATE'S CASE

The State called two White Castle employees and two restaurant patrons to testify about the events surrounding the shooting. The State's witnesses testified that the defendant walked up to the victim, shot him numerous times, and fled the restaurant. In addition, Tommy Marsh, one of the patrons, testified that he did not see the defendant engage in any bizarre behavior. Officer Joseph Carroll, one of the arresting officers, testified that the defendant did not show any confusion as to who the officers were. Officer Daniel O'Connor, one of the officers who was present when the defendant was brought back to the restaurant, testified that he did not notice the defendant engage in any bizarre behavior. The State also played the White Castle security tape. According to Detective Lazzara, the defendant got up and stood by the door facing the street. Approximately five minutes later, the defendant moved from the entrance, stood near the security guard, and began walking and shooting. Finally, the defendant exited the restaurant and ran across the parking lot.

THE DEFENDANT'S CASE

Dr. Seltzberg testified that, at the time of trial, she had worked full time at the Forensic Clinical Services as a forensic psychiatrist for 12 years. The first time she saw the defendant was in 1998 when he was referred for an evaluation on a misdemeanor assault charges. Dr. Seltzberg opined that the defendant had a psychotic disorder and was prescribed an antipsychotic medication.

The second time she saw the defendant was on February 13, 2004, and then on April 22, 2004. Prior to her February 13, 2004, evaluation, she reviewed a number of defendant's documents: (1) a 1997 arrest report that indicated defendant had paranoid ideas and delusions and indicated that the defendant was discharged from the United States Marines because of a mental illness; (2) her previous report from1998; (3) the medication profile from Cermak Health Services stating that the

defendant was prescribed antipsychotic medication; (4) Dr. Echevarria's reports in which he opined that the defendant was fit with medication to stand trial but was insane at the time of the offense; (5) the police reports from the instant shooting; and (6) a police report alleging that the defendant might have been the person who was asked to leave the restaurant prior to the shooting.

After meeting with defendant on February 13, 2004, Dr. Seltzberg reviewed the Veterans Administration (VA) Hospital records from 1984 which indicated that the defendant was delusional and believed that the Central Intelligence Agency and Federal Bureau of Investigation were trying to sabotage him and that he had auditory hallucinations. She also reviewed reports indicating that the defendant was admitted to the hospital in 1993, 1996, and 1998. Dr. Seltzberg reviewed the McNeal Hospital records which indicated that the defendant was in the hospital from July 18 until July 26, 2001, and diagnosed with paranoid schizophrenia. After the defendant was released from McNeal Hospital, he was transferred to the VA for outpatient treatment. The VA records noted that defendant stopped taking his medications. Therefore, the defendant was prescribed antipsychotic medications and released.

Dr. Seltzberg also testified that she reviewed the August 2002 VA records, which indicated that the defendant had been absent for three months but was taking his medication and doing well. The doctor also noted that "for years" the defendant did not comply with treatment and only became compliant when he was in trouble with the law. However, Dr. Seltzberg testified that the VA records indicated that the defendant went into remission with "Alansopin"[4] an antipsychotic agent.

Dr. Seltzberg testified that during her meeting with the defendant on April 22, 2004, she asked the defendant to talk about the incident leading to his arrest. The defendant said he had not

---

[4] "Alansopin" is the phonetic spelling of the drug.

been taking his medication because it made him drowsy. The defendant also told Dr. Seltzberg that, after he felt threatened by a man with a tattoo, he climbed through a window at his father's house and took a gun for protection. On the day of the shooting, he began to feel sleepy as he drank his coffee at the White Castle. The defendant reported that he observed the security guard and the employees "signaling" and thought they had done something to his coffee. The defendant felt threatened because the security guard had a gun, and he shot the guard in the head. The defendant ran toward the mosque for asylum and kicked the gun so the police would not get it.

Dr. Seltzberg diagnosed the defendant as chronic paranoid schizophrenic. She testified that there was no evidence of malingering; in fact, the defendant tried to minimize or deny any psychotic behaviors. She opined that the defendant was legally insane at the time of his offense because his prior history was consistent with violent and aggressive behavior, that there was evidence of schizophrenia, and that he was acutely psychotic at the time of the incident.

## THE STATE'S REBUTTAL

The State called Melvin Mickens, a Chicago police officer who also worked as a security guard, and Larry McCullum, the defendant's father, in rebuttal.

## ANALYSIS

In Illinois, "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2002). A person who was not insane at the time of the commission of the criminal offense, but was suffering from a mental illness, may be found guilty but mentally ill. 720 ILCS 5/6-2(c) (West 2002). In the Criminal Code "mentally ill"

means

"a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(d) (West 2002). When the defendant asserts the affirmative defense of insanity, the court may find the defendant guilty but mentally ill if the court finds: (1) that the State has proved beyond a reasonable doubt that the defendant is guilty of the offense charged; (2) that the defendant has failed to prove his insanity; and (3) that the defendant has proved by a preponderance of the evidence that he was mentally ill at the time of the offense. 725 ILCS 5/115-3(c) (West 2002). The defendant must prove by clear and convincing evidence that he is not guilty by reason of insanity. 720 ILCS 5/6-2(e) (West 2002).

In this case, the trial court found that the defendant failed to prove his insanity, by clear and convincing evidence, as required by section 115-3(c) of the Code of Criminal Procedure of 1963. 725 ILCS 5/115-3(c) (West 2002). A fact finder's resolution of the issue of the defendant's sanity at the time of the offense will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. People v. Urdiales, 225 Ill. 2d 354, 428 (2007), citing People v. Johnson, 146 Ill. 2d 109, 128-29 (1991). A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. People v. Deleon, 227 Ill. 2d 322, 332 (2008), citing In re D.F., 201 Ill. 2d 476, 498 (2002).

After reviewing the State's case in chief, the defendant's case, and the State's rebuttal, it is clear that this is not a case (1) where there is substantial disagreement among the testifying experts (see People v. Baker, 253 Ill. App. 3d 15, 28 (1993), citing People v. Williams, 201 Ill. App. 3d 207,

216-17 (1990)), (2) where Dr. Seltzberg's opinion suffered from a failure to consider relevant authorities or information concerning the defendant (see Baker, 253 Ill. App. 3d at 28, citing Williams, 201 Ill. App. 3d at 218), or (3) where Dr. Seltzberg ignored information that was contrary to her opinion (Baker, 253 Ill. App. 3d at 28, citing People v. Jackson, 170 Ill. App. 3d 77 (1987)). Indeed, Dr. Seltzberg's opinion that the defendant was insane at the time of the murder was supported by Dr. Echevarria, who testified during the pretrial proceedings. It should be noted that both psychiatrists were employed by the Cook County Forensic Clinical Services office, that they examined the defendant pursuant to court order, and that their opinions were based upon a reasonable degree of medical certainty. See Baker, 253 Ill. App. 3d at 28 (noting that the experts were bolstered by the fact that they were employed by the psychiatric institute). I note that the trial court judge qualified Dr. Seltzberg as a medical expert, relied on Dr. Seltzberg's opinion that defendant was a chronic paranoid schizophrenic, and then, although the medical expert's testimony was unrebutted and there was no medical evidence in the record to support the court's conclusion, rejected Dr. Seltzberg's opinion that defendant was insane at the time of the murder and lacked substantial capacity to appreciate the criminality of his conduct. See People v. Wilhoite, 228 Ill. App. 3d 12, 28 (1991), quoting People v. Arndt, 86 Ill. App. 3d 744, 749 (1980) (" 'it does not seem that the [trial] court questioned the credibility of the psychiatrists, but rather that it drew different conclusions than they did.' "); see also People v. Garcia, 156 Ill. App. 3d 417, 424 (1987); Baker, 253 Ill. App. 3d at 28.

The trial court's finding (1) that defendant was not insane, and (2) that defendant did not lack substantial capacity at the time of the murder to appreciate the criminality of his conduct is contrary to the following evidence: (1) Dr. Seltzberg's unrebutted testimony and defendant's medical records,

which established that the defendant's psychosis went into remission with an antipsychotic medication; (2) Dr. Seltzberg's unrebutted testimony that defendant told her he had not been taking his medication; and (3) Dr. Seltzberg's unrebutted testimony that defendant was insane on October 31, 2002. I believe that the psychiatrist's unrebutted testimony and the medical records established beyond a reasonable doubt that the defendant was insane at the time of the murder and that the defendant lacked the substantial capacity to appreciate the criminality of his conduct. I submit, given the unrebutted testimony from the psychiatrist, that the defendant proved by clear and convincing evidence that he was not guilty by reason of insanity. Therefore, the trial judge's finding that the defendant was mentally ill and appreciated the criminality of his behavior was against the manifest weight of the evidence because the finding was not based on any medical evidence in the record.

CONCLUSION

In conclusion, in order for the trial court to find the defendant guilty but mentally ill, section 115-3 of the Code of Criminal Procedure required the trial court to find that the defendant failed to prove his insanity. 725 ILCS 5/115-3 (West 2002). Dr. Seltzberg's opinion testimony that the defendant was insane at the time of the murder was unrebutted, therefore, the defendant proved his insanity with his medical records and with Dr. Seltzberg's clear and convincing unrebutted testimony. Because the defendant proved his insanity, the trial court's findings, that the defendant was mentally ill and appreciated the criminality of his conduct, were against the manifest weight of the evidence. Accordingly, I would (1) reverse the judgment of the trial court, and (2) remand the case to the trial court with directions (a) to enter a judgment of not guilty by reason of insanity, and (b) to hold a hearing, pursuant to the Mental Health and Developmental Disabilities Code 405 ILCS 5/1-100 *et seq*. (West 2002), to determine whether the defendant is subject to involuntary admission. 725 ILCS

1-05-3260

5/115-3(b) (West 2002).

| | |
|---|---|
| Please Use Following Form: | REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT<br>(Front Sheet to be Attached to Each Case) |
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>      Plaintiff-Appellee,<br><br>  v.<br><br>BRIAN McCULLUM,<br><br>      Defendant-Appellant. |
| Docket No. | |
| COURT | |
| Opinion Filed | No. 1-05-3260<br><br>Appellate Court of Illinois<br>First District, FOURTH Division |
| JUSTICES | October 15, 2008<br>(Give month, day and year) |
| | PRESIDING JUSTICE MURPHY delivered the opinion of the court:<br><br>Campbell, J.,          concur [s] |
| APPEAL from the Circuit Ct. of Cook Cty; | Neville, J.,<br>            dissent[s] |
| The Hon. _____, Judge Presiding. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable  Evelyn B. Clay  , Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago. | |
| For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br>Attorneys for Appellant: Michael J. Pelletier, Deputy Defender<br>    Patrick E. Cassidy, Appellate Defender<br>    203 N. La Salle Street, 24th Floor,<br>    Chicago, IL 60601<br>    Phone: (312) 814-5472 |
| Also add attorneys for third-party appellants or appellees. | Attorneys for Appellee: Richard A. Devine, Cook County State's Attorney<br>    James E. Fitzgerald, Peter Fischer,<br>    Assistant State's Attorneys, Of Counsel<br>    Room 309, Richard J. Daley Center,<br>    Chicago, IL 60602 |

-37-

1-05-3260

Phone:  (312) 603-1880

(USE REVERSE SIDE IF NEEDED)

-38-