THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HERSCHEL JACKSON, Defendant-Appellant.

First District (2nd Division)   No. 85—0421

Opinion filed August 4, 1987.—Rehearing denied December 10, 1987.

Steven Clark and Joan S. Colen, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Christopher J. Cummings, James E. Fitzgerald, and Robert M. Podlasek, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendant Herschel Jackson (Jackson) was indicted for murdering his mother, stepfather, and his six-year-old stepbrother. In December of 1982 he was found mentally unfit to stand trial, but on April 10, 1984, following a bench trial, Jackson was found guilty but mentally ill. Subsequently, he was found unfit for sentencing until January 21, 1985, when he was sentenced to natural life in prison.

Jackson's indictment was returned on July 2, 1982, and on July 28, 1982, his attorney, assistant public defender Dennis Tobin (Tobin), requested a Behavioral Clinic examination (BCX) in order to determine Jackson's fitness for trial. The trial court granted the request and Jackson was examined by Dr. R. A. Reifman (Reifman), director of the Psychiatric Institute of the Circuit Court of Cook County, who found Jackson unfit to stand trial. In a fitness hearing held December 20, 1982, Reifman testified that he believed Jackson was "unable to assist counsel in his own defense because of a mental condition, schizophrenia, and as such [was] not mentally fit to stand trial." The court agreed and custody of Jackson was given to the Illinois Department of Mental Health (DMH).

In a DMH progress report submitted March 10, 1983, Dr. Sklan opined that with psychotropic medication Jackson would be ready for a fitness evaluation. Accordingly, Dr. Gilbert Bogen (Bogen), staff psychiatrist of the Psychiatric Institute, examined him, but concluded that he was still unfit for trial. After a DMH progress report was issued on October 3, 1983, which stated that Jackson was once more ready for evaluation, Bogen again examined Jackson and concluded that he was "Mentally Fit for trial with medication."

At the trial, which began on April 10, 1984, detective Paul Carroll (Carroll) testified that on July 2, 1982, he received a report that three bodies had been found in a car parked on Chicago's North Avenue beach. When Carroll arrived at the scene, he encountered other policemen and observed a bloodstained station wagon that contained what were later identified as the bloody corpses of Matthew Behm, his father, and his stepmother. During a search of the car, the officers discovered papers bearing the Behms' address.

The police officers proceeded to the Behm residence and were admitted by Jackson. During a consensual search of the apartment, the officers observed that the floors throughout the apartment were bloody and that there was blood on Jackson's hands, feet, fingernails and toenails. Carroll also noticed buckets containing bloody water in the kitchen sink. He read Jackson his *Miranda* rights and Jackson

said that he understood them.

Jackson then told Carroll that he had come home two nights earlier and interrupted a home invasion by three men, that he chased the men out of the apartment and returned to find his stepfather, mother, and stepbrother stabbed to death. Jackson said that he put the three bodies in the car, cleaned up the apartment, and drove the car to the North Avenue beach. He asserted that he did not call the police because he was afraid that they would think he had murdered his family.

In the squad car on the way to the police station, Carroll pointed out to Jackson numerous inconsistencies in his story. Jackson then stated that about two weeks earlier he had come home late and his stepfather had evicted him from the house. When he returned home the following day his stepfather told him that he could not go out and that he would have to help him wallpaper a room the following night. Jackson stated that he stabbed his stepfather to death while they were wallpapering, then proceeded to stab his stepbrother to death. He waited several hours for his mother to return home, and when she did, he had a brief conversation with her, after which he stabbed her to death.

Jackson recounted to Carroll that he cleaned up the apartment, put the bodies in the car, covered the bodies with a newspaper and a box, and then left the car at 63rd and Stony Island Avenue in Chicago. He indicated that the following day he drove the car from 63rd and Stony Island Avenue to the North Avenue beach. When Carroll asked Jackson where the knife was, he replied that it was in the back room of the apartment in a pile of dirty clothes. Carroll called the apartment from the police car, and an officer who was there to investigate the alleged crime retrieved the knife from the pile of clothes.

The following stipulations were had at trial: that Officer Whelan would testify that he recovered the murder weapon from the Behm residence and that Dr. Stein would testify that the victims died from multiple stab wounds.

Reifman testified that he examined Jackson five times to determine if he was fit to stand trial and the state of his mind at the time of the killings. Dr. Reifman considered Jackson's confession, police reports, Jackson's social history as provided by his aunts, and reports from psychologists and mental health hospitals, but he disregarded any information that was not consistent with his opinion regarding Jackson. Reifman also testified that at the time of the offense Jackson suffered from a mental disease and that he lacked substantial capacity to conform his conduct to the requirements of the law.

The People presented four witnesses to rebut Jackson's insanity

defense. Octavia Lawson and Fred Lawson, his downstairs neighbors, both testified that they had known Jackson for about 10 years, that they had never noticed any abnormalities in his behavior, and that he had always been polite to them. Assistant State's Attorney Richard Mottweiler testified that he had interviewed Jackson and that he appeared to be normal. Detective Carroll said that he believed Jackson knew the consequences of his conduct and had tried to conceal the murders.

Immediately after the trial court pronounced its judgment of guilty but mentally ill, defense counsel requested a BCX to determine Jackson's fitness for sentencing. Reifman examined Jackson pursuant to the court-ordered BCX and found him unfit for sentencing. On December 12, 1984, Reifman advised the court that because Jackson was on medication he was fit for sentencing. During a fitness hearing on December 28, 1984, Reifman testified that Jackson had recovered sufficiently to be fit for sentencing, but that he would have to continue to receive medication.

On January 4, 1985, assistant public defender Paul Stralka (Stralka), who had replaced Tobin on the case after the latter left the public defender's office, advised the court that Jackson was not receiving medication, that his affect and demeanor had changed from the previous week, and that for these reasons he should have a BCX. The trial judge ordered the BCX and continued the matter to January 21, 1985, although he asserted that it was silly to do so because there was only one sentence he could give Jackson. On January 17, Reifman informed the court that he had not completed his examination of Jackson because Stralka had advised him not to examine Jackson before talking to Tobin, who had represented him at his trial.

On January 21, Stralka filed a motion for the appointment of a guardian *ad litem*, arguing that Tobin possessed certain information protected by the attorney-client privilege which related to Jackson's fitness for sentencing, but that Jackson was incompetent to waive the privilege, and that hence a guardian *ad litem* should be appointed to make that decision. The trial court denied the motion without comment. Stralka thereupon requested a continuance so that Reifman could complete the examination. In an angry colloquy, the trial judge dismissed Stralka from the case for refusing to allow Reifman to conduct the court-ordered BCX, an action which the judge took without anyone's consulting with Jackson about it or with anybody in his behalf. Following a brief recess, court reconvened and Jackson was represented by James Sammons (Sammons), another assistant public defender. After Sammons indicated that he had spoken with Jackson

and had read the file, the court sentenced Jackson to natural life.

■ Section 6—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(a)) defines insanity in the following manner: "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." The parties agree that the People had the burden of proving Jackson's sanity beyond a reasonable doubt. We should point out at this juncture that the relatively recent amendment to the statute shifting the burden of proof from the State to the defendant in cases where insanity is a defense applies solely to proceedings involving crimes committed after 1983, the appellate court having held that to apply such shifting to offenses committed before the statute was enacted would constitute an *ex post facto* application of the law. (*People v. Hickman* (1986), 143 Ill. App. 3d 195, 198, 492 N.E.2d 1091.) The trial court's determination that the People proved the defendant sane beyond a reasonable doubt is a factual finding. Accordingly, the reviewing court should "not disturb the *** finding unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice." *People v. Ford* (1968), 39 Ill. 2d 318, 321, 235 N.E.2d 576; accord *People v. Teague* (1982), 108 Ill. App. 3d 891, 899, 439 N.E.2d 1066, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206; *People v. Martin* (1980), 87 Ill. App. 3d 77, 81, 409 N.E.2d 114.

■■■ Although the defense presented an expert witness and the prosecution did not, the latter can meet its burden of proof without calling an expert. This court has noted that "it is well established that the State need not call an expert to rebut testimony by an expert called by the defense. *People v. Young* (1978), 60 Ill. App. 3d 351, 353, 376 N.E.2d 739." (*People v. Smith* (1984), 124 Ill. App. 3d 243, 250, 464 N.E.2d 685.) Furthermore, the weight given an expert's opinion is based on his reasoning and the facts he uses to support his opinion. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 899, 439 N.E.2d 1066, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206; *People v. Burress* (1971), 1 Ill. App. 3d 17, 20, 272 N.E.2d 390.) Dr. Reifman conceded that he ignored information contrary to his opinion; thus, in light of the doctor's *modus operandi*, the trial court was justified in not placing much weight on his conclusion that Jackson was insane at the time of the killings. Jackson's reliance on *People v. Garcia* (1987), 156 Ill. App. 3d 417, for the proposition that the prosecution must have expert witnesses is misplaced. Rather, the court in *Garcia* felt compelled to accept the testimony of the defendant's two

expert witnesses for the reason that the People did not attack their credibility, and not because the prosecution did not present any experts. 156 Ill. App. 3d at 424.

Despite defense counsel's argument to the contrary, the lay witnesses' testimony related to both prongs of the insanity test: appreciating criminality and ability to conform conduct. They all testified in detail about Jackson's ability to understand the criminality of his conduct, which was best illustrated by Jackson's attempted "cover-up." The apparent ineffectiveness of his effort is irrelevant; he still tried to conceal the crime. The lay witnesses also testified that Jackson was capable of behaving "normally"; indeed, Jackson's neighbors were not aware that he had been receiving medical treatment for his mental problems.

■ Defense counsel also contends that any damaging testimony from lay witnesses involved matters about which they should not have been allowed to testify. Such an assertion is incorrect because "lay witnesses may express their opinions as to sanity if such is based on personal observation of the accused (*People v. Mahon* (1979), 77 Ill. App. 3d 413, 395 N.E.2d 950), including conversations with him (*People v. Banks* (1974), 17 Ill. App. 3d 746, 308 N.E.2d 261)." (*People v. Clark* (1981), 102 Ill. App. 3d 414, 421, 429 N.E.2d 1255.) The conclusions reached by Carroll and Mottweiler were based on their conversations with Jackson wherein he described the killings. Opinions based on such conversations are clearly permissible; therefore, the trial court's ruling that Jackson did not satisfy the statutory requirements of the insanity statute is not against the manifest weight of the evidence.

■ The trial judge apparently removed Assistant Public Defender Stralka from the case because he believed that Stralka was hampering the administration of justice. In *People v. Gornick* (1982), 107 Ill. App. 3d 505, 510, 437 N.E.2d 892, the court noted that "[t]he right to be represented by counsel of defendant's own choosing may not be utilized to frustrate the administration of justice or to otherwise embarrass the effective prosecution of crimes." (See also *People v. Kleba* (1982), 110 Ill. App. 3d 345, 361, 442 N.E.2d 605.) The determination of what constitutes interference with the administration of justice is best made by the trial judge. In that connection this court has noted that such decision "lies within the sound judicial discretion of the trial court. The proper exercise of this discretion requires that the public need for efficient and effective administration of justice be weighed against the defendant's fundamental right to be represented by counsel of his choice." (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 197,

384 N.E.2d 767; accord *People v. Friedman* (1980), 79 Ill. 2d 341, 349, 403 N.E.2d 229; *People v. Langdon* (1979), 73 Ill. App. 3d 881, 888, 392 N.E.2d 142.) Although "[j]udicial patience need not be infinite" (*People v. Williams* (1982), 92 Ill. 2d 109, 116, 440 N.E.2d 843), the trial court must act reasonably when attempting to expedite the progress of a case.

■ The trial court did not act reasonably in removing the public defender from this case. The attorney was merely asking for a short continuance, the first requested by this attorney. In *People v. Reyes* (1981), 102 Ill. App. 3d 820, 429 N.E.2d 1277, defense counsel had received a one-week continuance prior to sentencing. The appellate court held that the trial court's denial of counsel's motion for a one-day continuance was an abuse of discretion. (102 Ill. App. 3d at 836.) Similarly, this court reversed a trial judge's denial of a continuance to a party who had previously been granted a one-month continuance. (*In re C.T.* (1983), 120 Ill. App. 3d 922, 928, 458 N.E.2d 1089.) Moreover, Stralka evidently believed that Tobin possessed privileged information which pertained to the court-ordered BCX, and therefore to Jackson's sentencing, that Jackson may have been incompetent to waive the attorney-client privilege, and it was for these reasons that defense counsel requested the appointment of a guardian *ad litem* before submitting his client to the BCX. In view of these circumstances, we are obliged to give the benefit of the doubt to counsel and hold that Stralka's motions to appoint a guardian *ad litem* and to continue the matter so that a BCX could be had were apparently made in the interest of furthering the proceedings, and not in order to hamper the administration of justice. We do not, however, condone Stralka's unilateral action of refusing to submit Jackson to the BCX in contravention of the court's order. The better procedure would have been to present a proper motion to the trial judge as soon as Stralka learned of Tobin's possession of the privileged information and not to have waited until the date set for the court to receive the results of the BCX. The proper course for the trial judge to have taken would have been to visit sanctions, if necessary, upon Stralka, and not to punish Jackson for his counsel's misconduct by depriving him of his fundamental right to counsel of his own choosing. Consequently, we conclude that the trial judge abused his discretion in removing the assistant public defender from this case because a trial court must use the same standards when removing a public defender from a case as it uses when removing any privately engaged attorney. *People v. Davis* (1983), 114 Ill. App. 3d 537, 449 N.E.2d 237.

■ Jackson does not ask this court for any relief from the trial

court's denial of the motion to appoint a guardian *ad litem*, perhaps because of mootness, therefore we grant no relief as to this ruling of the trial court; however, this cause is remanded to the trial court for a hearing to determine Jackson's fitness for sentencing. Accordingly, we affirm the trial court in part, remand for a fitness hearing, and thereafter for further proceedings consistent with this opinion.

Affirmed in part; remanded in part.

STAMOS and HARTMAN, JJ., concur.