# Illinois Official Reports

## Appellate Court

---

### *In re J.M.*, 2014 IL App (5th) 120196

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.M., Respondent-Appellant). |
| District & No. | Fifth District<br>Docket No. 5-12-0196 |
| Filed | April 18, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In juvenile proceedings arising from a fire that destroyed a home and the occupants' 13 dogs, the trial court erred in denying respondent's motion to suppress his inculpatory statement to the police, since the court's decision that respondent knowingly and intelligently waived his *Miranda* rights was against the manifest weight of the evidence, especially in view of his youth, his mental problems, his inability to read his rights, the credible testimony of the psychologist who evaluated him that he was impaired from understanding his rights due to his mild mental retardation, and the evidence that he apparently trusted the officers who intended to obtain a statement to use against him. |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 10-JD-216; the Hon. Walter C. Brandon, Jr., Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Ellen J. Curry, and Dan W. Evers, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Brendan F. Kelly, State's Attorney, of Belleville (Patrick Delfino, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the people.

Panel

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Justices Chapman and Schwarm concurred in the judgment and opinion.

**OPINION**

¶ 1    J.M., a minor, appeals from an order of the circuit court of St. Clair County entered after a discharge hearing held pursuant to section 104-25 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-25 (West 2010)). The circuit court found that the evidence produced by the State would be sufficient to prove J.M. guilty beyond a reasonable doubt of arson (720 ILCS 5/20-1(a) (West 2008)), theft under $300 (720 ILCS 5/16-1(a)(1) (West 2008)), burglary (720 ILCS 5/19-1 (West 2008)), aggravated arson (720 ILCS 5/20-1.1(a)(3) (West 2008)), and residential arson (720 ILCS 5/20-1(a) (West 2008)) and refused to discharge J.M. Because the discharge hearing did not result in an acquittal of the charges, J.M., who had previously been declared unfit to stand trial, was ordered to seek further treatment in an attempt to restore fitness. In this appeal, J.M. contends the juvenile court erred in denying his motion to suppress his statement because the State failed to prove that he knowingly waived his *Miranda* rights and made a voluntary statement to police. See *Miranda v. Arizona*, 384 U.S. 436 (1966). J.M. asserts that without the statement, the remaining evidence is insufficient to prove him guilty beyond a reasonable doubt of any of the above charges, and, thus the admission of the statement was not harmless beyond a reasonable doubt. For the following reasons, we reverse and remand.

¶ 2                                   BACKGROUND
¶ 3    On August 30, 2010, J.M. (date of birth May 5, 1997) and another juvenile participated in starting a fire at a residence in East Carondelet. The juveniles were detained by the Dupo police department where J.M. gave a statement recorded on DVD in which he admitted to participating in the above-cited crimes. On September 1, 2010, the State filed a petition for adjudication of wardship on the basis that J.M. committed arson on August 30, 2010. The petition was later amended to include all of the above-cited crimes. On November 15, 2010, the trial court entered an order appointing Dr. Daniel J. Cuneo, a clinical psychologist, to

evaluate J.M. for the purpose of establishing an opinion as to J.M.'s ability to knowingly waive his *Miranda* rights. On December 30, 2010, Dr. Cuneo submitted his report in which he concluded that it was his "opinion that [J.M.'s] mental illness (Mild Mental Retardation) substantially impaired his ability to knowingly waive, read, write, and understand his *Miranda* rights."

¶ 4 On March 23, 2011, an order was entered in which the trial court found that defense counsel raised a *bona fide* doubt as to respondent's fitness to stand trial and, therefore, again appointed Dr. Cuneo for the purpose of evaluating J.M. to determine whether he was fit to stand trial on the charges. On June 22, 2011, the parties stipulated to a report by Dr. Cuneo, dated April 25, 2011, that J.M. was not fit to stand trial. In the report, Dr. Cuneo again concluded that J.M. functions in the mild mentally retarded range of intelligence with a verbal IQ of 54, a performance IQ of 68, and a full-scale IQ of 56. Because of his mental retardation, Dr. Cuneo opined that J.M. could not be made fit within one year.

¶ 5 On August 3, 2011, J.M. filed a motion to suppress confession in which he alleged his mild retardation substantially impaired his ability to knowingly waive his *Miranda* rights and, therefore, his confession was not knowing and intelligent. J.M. asked that his taped confession obtained by Investigator Matt Jany on August 30, 2010, be suppressed. On September 16, 2011, a hearing was held on the motion to suppress.

¶ 6 At the hearing, Greg Vespa, a juvenile officer employed by the Illinois State Fire Marshal's office, testified that on August 30, 2010, he investigated a fire in East Carondelet where J.M. was found at the scene acting suspiciously along with another juvenile. When Vespa asked J.M. whether they had done anything they should not have done, J.M. nodded his head yes. The two juveniles were transported in separate squad cars and questioned at the Dupo police station. Vespa identified People's Exhibit 1 as the DVD containing the video interrogation of J.M. in which J.M. confessed. Vespa testified he believed J.M. understood the *Miranda* rights read to him, and, as a juvenile officer, he never had a case in which he believed the juvenile did not understand his *Miranda* rights.

¶ 7 St. Clair County Sheriff's Deputy Matt Jany testified that after speaking with J.M. at the scene, he contacted J.M.'s mother. Jany testified that the mother arrived at the police station, but did not want to sit in on the interrogation. Jany believed J.M. understood what was going on during the interrogation.

¶ 8 J.M.'s mother testified she was called at work after J.M. was arrested. She cleans buildings and was working that evening. When she arrived at the police station, she waited in the hall until J.M. was allowed to come out and speak to her. She testified no one told her that J.M. was going to be questioned or that she could be present. The police told her J.M. would not be going home that evening. Vespa and Jany both contradicted J.M.'s mother's testimony and testified that J.M.'s mother was told she could be present during questioning, but she stayed in the lobby instead.

¶ 9 Dr. Cuneo testified that he evaluated J.M. twice and reviewed the DVD of J.M.'s statement. J.M. was in special education classes, which was consistent with his low IQ testing. He testified that J.M. is intellectually in the bottom .04% of the population and that J.M. cognitively functions as a seven-year-old and reads at a first-grade level. According to Dr. Cuneo, J.M. could not read the words "animal, spell, finger, or size." Dr. Cuneo testified that J.M. was incapable of reading or understanding his *Miranda* rights, and he opined that J.M. could not knowingly and intelligently waive his *Miranda* rights. Dr. Cuneo specifically stated:

"[J.M.] couldn't understand if you do talk to us, everything that you say can be used against you in a court. When I pushed him on what does that mean, he just kept shrugging he didn't know. Even after repeated attempts, he could never grasp that once they started answering–once they started questioning him, he could stop answering if he chose to do so.

He kind of figured if, you know, somebody in authority asked you questions, you answer questions. I mean, ask you a question, you answer it."

¶ 10    According to Dr. Cuneo, because of J.M.'s limited intellectual abilities, J.M. is suggestible and easily led, especially by individuals in positions of authority.

¶ 11    The trial court found that J.M.'s intellectual ability "alone does not indicate J.M. is incapable of waiving his constitutional rights." The trial court also noted that reading level alone was not enough to justify a finding that a minor is incapable of waiving his rights. The court noted that on the DVD, J.M. appeared relaxed and admitted that he had on a previous occasion been read his *Miranda* rights. The trial court denied J.M.'s motion to suppress.

¶ 12    On February 3, 2012, a discharge hearing was conducted pursuant to section 104-25 of the Code (725 ILCS 5/104-25 (West 2010)), after which the trial court found that the evidence produced by the State would prove J.M. guilty of the offenses with which he was charged. During the hearing, the parties stipulated that Dr. Cuneo would testify consistently with his report dated November 23, 2010, and his testimony adduced at the hearing on the motion to suppress.

¶ 13    Rhonda Tutor, who lived at the home destroyed by the fire, testified that she lived with her husband and 13 dogs. She was gone when the fire occurred. She received a telephone call while she was at work that her house was on fire. She lost everything, including her dogs. She testified that she had not given the juveniles who were on the scene permission to be at her house and had never laid eyes on J.M. until the day of the hearing.

¶ 14    Scott McFall, who lives behind the Tutors' house, testified that he heard an explosion and turned around to find the Tutors' house engulfed in flames. McFall called 9-1-1 and then Ray Tutor. McFall said that earlier that day, the other juvenile involved in the arson stopped by his house and told him that he needed a jump start to a maroon car parked approximately one block away. When McFall arrived at the car, the juvenile told him he actually needed gas, which McFall did not have. McFall identified J.M. as being the other juvenile in the car. As the fire department was putting out the fire, the two juveniles walked by the scene and McFall advised the police, who were also on the scene, that he had seen the juveniles earlier. On cross-examination, McFall admitted that he had not seen either J.M. or the other juvenile start the fire nor did he see them in the shed where the fire started.

¶ 15    Greg Vespa testified that he investigated the fire as part of his job as an investigator with the State Fire Marshal's office. By the time he arrived on the scene, the fire was "pretty much out." He learned that there were two young, black male subjects in the area prior to the fire and that a road flare was found in the back yard of the house that burned. Vespa talked to the other juvenile at the scene. According to Vespa, J.M. would shake his head to indicate the opposite of what the other juvenile was telling Vespa. The other juvenile said they rode their bikes to the area, but changed his story when he was confronted about the car McFall had advised them about. Vespa said he did not talk to J.M. at the scene, but interviewed him separately at the police department. Vespa called the St. Clair County sheriff's department to ask for assistance in interviewing the suspects.

¶ 16    Prior to the interviews, Vespa processed the arson scene. He identified numerous pictures he took at the scene. Vespa testified that after interviewing the juveniles, he determined that the other juvenile started the fire using a flare he found in the shed of the Tutors' home. The fire spread from the shed to the house due to "20 mile-an-hour crosswinds."

¶ 17    On cross-examination, Vespa said he talked to the other juvenile, and then after he saw J.M. shaking his head in opposition, he talked to J.M. for a minute or two, at which time he separated the juveniles and secured them in squad cars. Vespa admitted that without J.M.'s cooperation, "it would probably [have] been an undetermined cause of the fire not being able to rule out certain things."

¶ 18    Matt Jany testified that he received a call at approximately 5:45 p.m. on August 30 about arson at the home of Ronald and Rhonda Tutor. He arrived on the scene at 6:30 p.m. and talked to Greg Vespa, who told him that it appeared the fire had been deliberately set by two juveniles. Vespa introduced him to J.M. and the other juvenile. Jany contacted J.M.'s mother by phone and advised her that her son had been taken into custody and that the police needed to speak with him. The two juveniles were transported separately to the Dupo police department. A video interview was conducted with J.M. within an hour of J.M.'s arrival at the police department and shortly after J.M.'s mother arrived. Jany was unaware that J.M. had any disabilities. J.M. told Jany he had a sixth-grade education. The DVD was then played for the court. In the DVD, J.M. admits that the other juvenile started the fire using a flare. J.M. did not know why the other juvenile started the fire. He said at one point he tried to put out the fire, but was unable to do so.

¶ 19    On cross-examination, Jany admitted J.M.'s mother arrived at the police station at 8:15 p.m., so there was at least 1 hour and 15 minutes in which J.M. was with police officers but not his mother. Jany said he asked J.M.'s mother if she wanted to be in the room when J.M. was interviewed, but she declined. Jany admitted that he was unaware that J.M. was mildly mentally retarded and that he only reads at a first-grade level. He admitted that J.M. had trouble reading the first *Miranda* right read to him on the DVD and he read them for him. He never asked J.M. to explain what he read to him. He admitted that he had no way of knowing whether J.M. understood his *Miranda* rights. At one point during the interview, Jany told J.M. there was surveillance at the house, but in fact there was no such surveillance. He also told J.M. there could be fingerprints, but Jany admitted there were no fingerprints. He admitted that Vespa told J.M. that there were fibers found at the scene, but there were no such fibers. Jany admitted that when he learned techniques about how to mislead suspects, he did not learn anything about how these techniques might affect a person with a low IQ.

¶ 20    The defense moved for a directed verdict, which the trial court denied. The defense did not present any evidence. The trial court found that the State carried the burden in the discharge hearing and that the evidence presented proved the minor guilty beyond a reasonable doubt. The State asked for clarification of the counts, and the trial court replied, "I'm saying all of them." J.M. filed a timely notice of appeal.

¶ 21                                                    ANALYSIS

¶ 22    The issue raised in this appeal is whether the trial court erred in denying J.M.'s motion to suppress his statement. J.M. contends the trial court's finding that he understood his rights,

knowingly waived them, and gave a voluntary statement to the police is contrary to the manifest weight of the evidence. We agree.

¶ 23     The issue of whether a *Miranda* waiver is knowing and intelligent is a question of fact and is therefore reviewed under a manifest weight of the evidence standard. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003, 1010 (2000). A finding is against the manifest weight if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based upon the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332, 882 N.E.2d 999, 1005 (2008).

¶ 24     Before a defendant's confession can be admitted at trial, the State must prove by a preponderance of the evidence that the defendant validly waived his or her privilege against self-incrimination and his or her right to counsel. *In re W.C.*, 167 Ill. 2d 307, 327, 657 N.E.2d 908, 919 (1995). In order to be valid, a defendant's waiver of *Miranda* rights must be knowing and intelligent, which means it must reflect an intentional relinquishment or abandonment of a known right or privilege. See *People v. Braggs*, 209 Ill. 2d 492, 514, 810 N.E.2d 472, 486 (2003). The mental state necessary to validly waive *Miranda* rights involves being aware at all times of not only the State's intention to use one's statements to secure a conviction, but also the fact that one can stand mute and request a lawyer. *In re W.C.*, 167 Ill. 2d at 328, 657 N.E.2d at 919.

¶ 25     The critical test used in determining whether an accused knowingly and intelligently waived his or her rights is whether the words in the context used, considering the age, background, and intelligence of the individual being interrogated, convey a clear and understandable warning of all his or her rights. *In re W.C.*, 167 Ill. 2d at 329, 657 N.E.2d at 919-20. Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of each case, including the defendant's background, experience, and conduct. *Braggs*, 209 Ill. 2d at 515, 810 N.E.2d at 487. Illinois courts have long recognized that a defendant's mental capacity at the time of the alleged waiver must be considered in determining whether his or her actions were knowing and intelligent, and while mental deficiency alone does not render a statement unintelligent, it is a factor that must be considered. *In re W.C.*, 167 Ill. 2d at 328, 657 N.E.2d at 919.

¶ 26     Moreover, our supreme court has specifically stated that "[t]he greatest care must be taken to assure that a juvenile's incriminating statement was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re W.C.*, 167 Ill. 2d at 328, 657 N.E.2d at 919. In addition, our supreme court has explicitly stated that care must be taken with defendants who are mentally deficient due to the following:

> "[I]t is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs*, 209 Ill. 2d at 514, 810 N.E.2d at 486 (citing Morgan Cloud *et al.*, *Words Without Meaning: The Constitution, Confessions and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495, 503, 538 (2002), and Paul T. Hourihan, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 Va. L. Rev. 1471, 1473 (1995)).

¶ 27     Therefore, when dealing with a mentally deficient juvenile, extreme care must be used to assure that he knowingly and intelligently waived his rights.

¶ 28    In *In re M.W.*, 314 Ill. App. 3d 64, 731 N.E.2d 358 (2000), the First District determined that a minor who was charged with first-degree murder and aggravated arson did not make a knowing and intelligent waiver of his *Miranda* rights prior to giving incriminating statements and, therefore, his statements were involuntary. In that case, the minor was 13½ at the time of his arrest. *In re M.W.*, 314 Ill. App. 3d at 69, 731 N.E.2d at 361. His IQ was between 52 and 54, which placed him in the borderline mentally retarded range. *In re M.W.*, 314 Ill. App. 3d at 69, 731 N.E.2d at 361. His reading and spelling levels were those of a second grader, and he was in special education classes. *In re M.W.*, 314 Ill. App. 3d at 69, 731 N.E.2d at 362. He could not explain the meaning of words such as "right" and "silent" contained in *Miranda* warnings. *In re M.W.*, 314 Ill. App. 3d at 70, 731 N.E.2d at 362. At least one expert testified that M.W.'s ability to understand *Miranda* warnings was limited. *In re M.W.*, 314 Ill. App. 3d at 70, 731 N.E.2d at 362. There are numerous similarities between *In re M.W.* and the instant case.

¶ 29    For example, J.M. was also 13 years of age; however, his mental capacity was that of a 7-year-old. His IQ was either 54 or 56, which, like *In re M.W.*, puts him in the mild mentally retarded range. J.M. also attended special education classes and was unable to explain the meaning of the word "silent" with regard to the first *Miranda* warning. Additionally, an expert testified that J.M. did not knowingly and intelligently waive his *Miranda* rights.

¶ 30    Here, Dr. Cuneo evaluated J.M. on two separate occasions: first, to determine whether J.M. was fit to stand trial and, second, to determine whether he could knowingly and intelligently waive his *Miranda* rights. Dr. Cuneo specifically found that J.M., who only reads at a first-grade level and who was intellectually in the bottom .04% of the population, was incapable of reading or understanding his *Miranda* rights. Our own review of the videotaped statement contained on the DVD shows that J.M. was incapable of reading his rights.

¶ 31    J.M. could not even read the word "silent" in the first warning. The DVD shows that after J.M. had trouble reading the word "silent," Officer Jany took over and read him his rights, trying to explain them along the way. Jany also told J.M. that J.M.'s mother was outside and she just hoped J.M. would be honest. After Jany read J.M. each of his rights, he told J.M. to initial and then sign the form. J.M. complied. Even though J.M. said he watched rights being given on television and had been read his rights "at the other station" on a different occasion, our review of the DVD does little to alleviate our concerns that J.M. did not fully appreciate that it was the State's intention to use his statement to secure a conviction against him or that he had the right to stand mute and request a lawyer. Instead, it appears to us that J.M. was compliant and wanted to please the officers, which, as previously discussed, is common among those suffering a mental deficiency.

¶ 32    The record before us establishes that respondent was initially found unfit to stand trial due to his limited intellectual abilities. While we agree with the State that the standards that must be met for determining fitness and the admissibility of a confession are quite different and that a finding of unfitness does not necessarily require a finding that a confession is inadmissible (*People v. Rockamann*, 79 Ill. App. 3d 575, 581, 399 N.E.2d 162, 166 (1979)), we cannot say that under the circumstances presented here the trial court did not err in finding J.M.'s statement admissible. The record establishes that J.M. was unable to read his *Miranda* rights. The only expert who testified in this case was Dr. Cuneo, who found respondent was unable to knowingly and intelligently waive his *Miranda* rights. Dr. Cuneo's opinion was well reasoned and sound and was as follows:

"So I think if you put it altogether, you put together the limited intellectual ability, the fact that he couldn't read the *Miranda* rights, the fact that he could not understand some of the *Miranda* Rights, and the fact that he was being questioned by an individual in authority, it's my opinion when you look at those factors, that he could not knowingly, intelligently, and willingly waive his *Miranda* Rights ***."

¶ 33 While the State need not call an expert to rebut testimony by an expert called by the defense (*People v. Jackson*, 170 Ill. App. 3d 77, 82, 522 N.E.2d 577, 580 (1987)), the trial court's reliance on Jany's and Vespa's testimony to counter Dr. Cuneo's testimony was inadequate.

¶ 34 Jany and Vespa both testified they were unaware that respondent suffered from any type of mental deficiency. They thought respondent was a normal 13-year-old who was in the sixth grade and could appreciate the severity of the situation he was facing. The trial court clearly relied on Jany's and Vespa's belief that J.M. understood his rights; however, both Jany's and Vespa's testimony is based upon the faulty assumption that J.M. was functioning at a normal capacity.

¶ 35 Moreover, the trial court relied on the fact that J.M. understood his rights because they were read to him on a previous occasion in another unidentified matter. However, just because respondent was previously read his rights in no way means that he understood what was read to him on either occasion. Finally, the trial court relied on the fact that the DVD showed the "relaxed nature of the give-and-take conversation between the minor and the *** officer." However, our own review of the DVD not only shows that J.M. is unable to read his rights, but also indicates that respondent put his trust in Jany and Vespa despite their intention to get a statement to use against him.

¶ 36 Considering the totality of the circumstances, J.M.'s youth, his mental deficiencies, the DVD which shows not only his inability to read his rights, but also his trust in Jany and Vespa despite their intention to get a statement to use against him, and Dr. Cuneo's credible, expert testimony, we find that the trial court's decision that respondent knowingly and intelligently waived his *Miranda* rights is against the manifest weight of the evidence.

¶ 37 The State does not even attempt to argue that even if erroneously admitted, the introduction of J.M.'s videotaped confession into evidence constitutes harmless error, because the State understands that it was not harmless error. Admission of an unlawfully obtained confession rarely constitutes harmless error. *People v. Daniels*, 391 Ill. App. 3d 750, 793, 908 N.E.2d 1104, 1138 (2009). Furthermore, Vespa admitted that without J.M.'s cooperation, the cause of the fire would probably never have been known.

¶ 38 Accordingly, we reverse the order of the circuit court of St. Clair County denying respondent's motion to suppress because the evidence fails to show that J.M. made a knowing and voluntary waiver of his rights under *Miranda.* We remand for further proceedings consistent with this opinion.

¶ 39 Reversed and remanded.