**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210405-U

Order filed January 25, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* D.B. | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
|     a Minor, | ) | Henry County, Illinois, |
| | ) | |
| (The People of the State of Illinois | ) | |
| | ) | Appeal No. 3-21-0405 |
|     Petitioner-Appellee, | ) | Circuit No. 20-JD-2 |
| | ) | |
|     v. | ) | |
| | ) | |
| D.B., | ) | Honorable |
| | ) | Terence M. Patton, |
|     Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice O'Brien and Justice Lytton concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The respondent knowingly and intelligently waived his *Miranda* rights.

¶ 2    The respondent, D.B., appeals the Henry County circuit court's denial of his motion to suppress statements. The respondent argues that he did not knowingly and intelligently waive his *Miranda* rights and therefore, the statements were inadmissible.

¶ 3                                    I. BACKGROUND

¶ 4        The State filed a petition for adjudication of wardship against the respondent pursuant to section 5-520 of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5-520 (West 2018)) alleging that the respondent committed the offenses of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40 (West 2018)) and aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). At the time of the offense, the respondent was 17 years old and the victim was 3 years old. The respondent was found unfit, and the matter proceeded to a discharge hearing.

¶ 5        At the hearing, the victim's brother, Dennis M., testified that he observed the victim on her stomach with her pants pulled down and the respondent on top of her. Dennis saw the respondent pull his pants up. He told the respondent to get off the victim. The respondent told Dennis that he was sorry.

¶ 6        A physician's assistant testified that he examined the victim and observed redness in her vaginal region, a small laceration, and a widened hymen. These observations were "consistent with penetration."

¶ 7        A recording of the respondent's interview with police wherein he confessed was admitted into evidence. The respondent moved mid-hearing to suppress, however, the court found the motion untimely.

¶ 8        The court found the respondent not not guilty. The respondent appealed and this court remanded for a suppression hearing. See *In re* D.B., 2021 IL App (3d) 200425-U, ¶ 43.

¶ 9        On remand, the respondent filed a motion to suppress his confession arguing that he did not knowingly and voluntarily waive his *Miranda* rights. The motion did not argue or cite to section 5-401.5 of the Act (705 ILCS 405/5-401.5 (West 2018)), which provides for when statements of a minor may be used.

¶ 10        At the suppression hearing, Nathan Petersen testified that while employed with the Morrison Police Department he contacted the respondent on behalf of Henry County detectives and provided the respondent a ride to the police station so the detectives could speak with him regarding a sexual assault.

¶ 11        Detective Sergeant Josh Verscheure testified that he interviewed the respondent at the Morrison Police Department in what he called a conference room. The respondent's mother, an adult male whom Verscheure believed to be a friend of the family, and Detective Joe Bedford were also present. Verscheure did not wear a police uniform. The room was never locked. The respondent was never handcuffed nor restrained during the interview. Bedford provided the respondent *Miranda* warnings, and the detectives answered any questions the respondent or the adults had. The respondent agreed to talk with the detectives and his mother was agreeable to him talking. Neither detective (1) ever raised their voice or argued with the respondent; (2) "question[ed] his answers, as far as being a liar"; (3) displayed a weapon or threatened the respondent; (4) attempted to deceive or trick the respondent; or (5) made any promises to the respondent regarding the outcome of the matter or leniency. The interview took place mid to late morning and lasted less than 30 minutes.

¶ 12        Based upon his observations and the fact that the respondent's answers made sense in light of the questions, Verscheure believed that the respondent understood the questions he was being asked. The respondent's answers were not simply yes or no. There was nothing about the respondent's speech or responses that led Verscheure to believe that the respondent did not understand the questions or what he was doing. The respondent's demeanor was "normal for the circumstances."

¶ 13        Bedford testified that when he met with the respondent, the respondent's mother and an uncle or the mother's boyfriend were present. The adults remained with the respondent throughout the interview. Bedford was not wearing a police uniform. Prior to the interview, he contacted the respondent's father, who had custody of the respondent, and requested to speak with the respondent. Bedford invited the respondent's father to the interview. The respondent's father was unable to attend but gave permission to interview the respondent.

¶ 14        Bedford advised the respondent of the *Miranda* warnings. He did so even though the respondent was not under arrest because he always provides the *Miranda* warnings when he interviews an individual in relation to a crime. The respondent agreed to speak with Bedford. The respondent's mother also agreed to the respondent speaking with Bedford. Bedford could tell the respondent had some "cognitive issues." Bedford had experience dealing with juveniles with cognitive issues. Bedford talked to the respondent in a calm manner and used as simple of words as he could during the interview.

¶ 15        Bedford believed that the respondent understood the questions Bedford asked him. He based this belief on the facts that the respondent understood why Bedford was talking to him, the respondent answered his questions, and the respondent was forthcoming with information. Also, Bedford relied on the respondent's mother to indicate if the respondent did not understand. Additionally, the respondent's answers to Bedford's questions made sense in relation to the questions being asked. The respondent provided explanations and details. There was nothing about the respondent's answers or demeanor that made Bedford think that the respondent did not understand what he was doing during the interview. The respondent did not seem confused by any of the questioning. When the respondent did not understand certain terms used by Bedford, he let Bedford know and Bedford reworded his question. Despite believing the respondent

functioned at an age younger than he was, which was 17 at the time of the interview, Bedford still believed that the respondent understood what was going on in the interview.

¶ 16        Dr. Joel Eckert testified as an expert in clinical psychology. He completed an evaluation of the respondent to determine his cognitive abilities. Eckert explained that "in comparison to a normative or randomly chosen group of [the respondent's] same-age peers, 99 *** of that randomly selected group *** would have more adequate receptive language skills than [the respondent] demonstrated." He further explained that receptive language skills include "the ability to understand spoken language. It's the degree of complexity, sophistication you can demonstrate when you're speaking with somebody else. How much do you understand. At what level of complexity." Eckert testified the respondent's receptive language equivalent was 9 years and 6 months, although he had previously testified it was 8 years and 11 months, and the respondent's full scale intelligence quotient (IQ) was 65. The respondent indicated to Eckert that he had been in special education classes. In Eckert's experience someone with similar cognitive capabilities to the respondent would state that he understands something when he does not because he would not want to appear stupid. In Eckert's opinion, the respondent would not be able to understand his *Miranda* rights. Eckert was asked if the respondent would have been able to knowingly waive his *Miranda* rights and he replied "His level of insight is minimum. No, he would not have fully comprehended any of that." The respondent would not have been able to understand the consequences of waiving his rights. It was Eckert's understanding that the respondent was a shaken baby, that the respondent's mother was in special education classes, and that the respondent's mother had lost her parental rights regarding the respondent.

¶ 17    Eckert never reviewed the audio or video footage of the respondent's interview. He did not see the questions the detectives asked, or the responses provided by the respondent. Eckert did not know the warnings that were given to the respondent.

¶ 18    Eckert noted that an individual that is developmentally disabled "would be able to tell you what happened from their point of view" during an interrogation "[b]ut their level of insight and sophistication with regard to providing that information would be quite limited." Explaining further, Eckert stated that "[t]hey can give very nonabstract, concrete, factual answers." Eckert believed that the respondent would be capable of providing "factual information, this happened, and this happened, and this happened[.]" However, he still believed that the respondent would not be able to understand some questions being asked, but Eckert could not say which questions because he did not know what the respondent was asked during the interview.

¶ 19    Based on Eckert's assessment he did not believe that the respondent would ask for clarification or indicate if he did not understand something and it would be unlikely for him to do so. Eckert stated that "[i]n a simplistic manner, in a simplistic way of thinking, [the respondent] would understand something. But it's the degree of complexity that I think is the issue here." The normal-functioning public would understand more of the complexity of the *Miranda* warnings than the respondent, but he was "not sure anyone understands—can think of every single ramification that could occur." When asked if his testimony that the respondent would not be able to adequately comprehend his *Miranda* rights and the implications of waiving those rights, and that if the respondent said he understood his rights he would just be acquiescing was based on Eckert's view that the respondent would not understand the words being read to him, Eckert stated "it's a contextual kind of thing" and "[the respondent's] receptive vocabulary appears to

be so limited that he wouldn't be able to understand them, the—the ramifications of waiving his rights."

¶ 20     The recording of the respondent's interview was admitted into evidence. As summarized in this court's prior order, *D.B.*, 2021 IL App (3d) 200425-U, ¶¶ 15-17:

"In the recording, Bedford read respondent his juvenile *Miranda* rights. Bedford stopped several times and asked respondent if he understood. Each time, respondent replied, 'Yes.' Bedford asked respondent if he wanted a lawyer 'right now.' Respondent shook his head. Respondent's mother said, 'Your dad's gonna get you one.' She then looked at the officers and said, 'But he's not here.' Verscheure said that respondent could ask for a lawyer at any time, and they would stop the interview. Respondent's mother asked, 'That doesn't mean he can walk out of here, right?' Verscheure replied, 'No, it just means that he doesn't want to talk anymore.' Bedford then asked respondent if he wanted to talk to him without a lawyer. Respondent nodded his head. Bedford asked respondent if he could read and write in English. Respondent said, 'Yeah.' Bedford asked respondent if he had a hard time writing. Respondent said nothing. Bedford asked respondent if he could write 'really well.' Respondent said, 'I think so.' Bedford then asked respondent's mother to sign the *Miranda* form.

Bedford asked respondent if he knew why he was there. Respondent said that he was there because of 'what [he] did to the little girl.' Respondent said that he was at Dennis's house in Dennis's bedroom at the time of the incident. Dennis went downstairs. A few seconds after Dennis left the room, respondent said that

7

he pulled the victim's pants down and placed his 'dick' in the victim's 'butt.' The victim was on her belly on the floor, and respondent was on top of her.

Bedford asked respondent if he watched pornography on the internet. Respondent said he watched pornography on his cell phone. Respondent said he did not search for child pornography. Bedford asked respondent what he would say to the victim and her family if he could tell them something. Respondent said he was sorry for what he did, he knew it was wrong, and he would take it back if he could."

¶ 21 Additionally, the recording shows that in the initial part of the interview, after talking about the *Miranda* rights and whether the respondent could read and write English, Bedford asked if the respondent understood what he was saying, and the respondent answered affirmatively. Bedford then told the respondent that at anytime if he did not understand something to look at Bedford and say that he did not understand because Bedford was not going to put words in the respondent's mouth and the respondent agreed. When asked if he was on his knees or laying down on top of the victim, the respondent indicated that he was in a push-up position. When the respondent did not understand the term "erection" he stated that he did not understand, and Bedford reworded his question. When the respondent's mother wanted to speak or interject, she was allowed to do so.

¶ 22 During arguments on the motion, the respondent's counsel did not argue inadmissibility based upon section 5-401.5(a-5)(1) of the Act. The court held that the respondent was in custody and that he knowingly and intelligently waived his *Miranda* rights. In doing so, the court found that the respondent's mother was a concerned adult "clearly looking out for [the respondent]." It noted Eckert's opinion that the respondent would not be able to understand the *Miranda* rights

8

but stated that Eckert's opinion was that no individual with the respondent's cognitive abilities would ever be able to understand and waive *Miranda* rights, which was not the law. The court also commented on the fact that Eckert had not reviewed the recording of the interview. The court noted how the respondent spoke up when he did not understand something, despite Eckert's opinion that someone with the respondent's mental capabilities likely would not do that. The court determined that the respondent "was willing to speak up and say if he didn't understand something. He wouldn't just automatically agree. He would speak up and contradict this detective." The court also determined that the answers the respondent gave "made sense, which is an indication that he understood the question that was being asked." It concluded that the respondent understood his rights, the consequences, and that the statements could be used against him in court. The court denied the motion to suppress. The respondent appeals.

¶ 23                                                    II. ANALYSIS

¶ 24        The respondent argues that his recorded interview should have been suppressed because he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

¶ 25        "[W]e review *de novo* the ultimate question of whether defendant's confession was voluntary after examining the totality of the circumstances" but will only overturn the circuit court's factual findings "if they are against the manifest weight of the evidence." *People v. Patterson*, 2014 IL 115102, ¶ 37. "The issue of whether a *Miranda* waiver is knowing and intelligent is a question of fact and is therefore reviewed under a manifest weight of the evidence standard." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 23; see also *People v. Daniels*, 391 Ill. App. 3d 750, 780 (2009) (stating the issue of whether a *Miranda* waiver is knowing and intelligent is a factual issue reviewed under the manifest weight of the evidence standard).

9

¶ 26    To be valid, a waiver of *Miranda* rights must be voluntarily, knowingly, and intelligently made. *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003). "A criminal suspect is not required to know and understand every possible consequence of a waiver of the Fifth Amendment privilege for it to be knowingly and intelligently made." *Id.* at 515. "To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *In re W.C.*, 167 Ill. 2d 307, 328 (1995). A determination as to whether a defendant intelligently waived his rights depends on the facts and circumstances of each case, "including the defendant's background, experience, and conduct." *Id.* The mental capacity of the individual must be taken into account, however "mental deficiency, of itself, does not render a statement unintelligent." *Id.* In examining the totality of the circumstances regarding whether a confession is voluntary "[r]elevant factors to consider include the minor's age, mental capacity, education, physical condition, the legality and length of the interview, and physical or mental abuse by the police, as well as the presence of a concerned adult and any attempts by the police to prevent or frustrate that contact." *Patterson*, 2014 IL 115102, ¶ 58. "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." *People v. Morgan*, 197 Ill. 2d 404, 437 (2001).

¶ 27    Here, the respondent was provided his *Miranda* warnings and affirmatively responded when Bedford asked if he understood those warnings. The respondent was specifically asked if he wanted to speak with the detectives without a lawyer, and he agreed. Additionally, the respondent was 17 years old at the time of the interview and his mother was present. Although the respondent's mother may not have had parental rights, she was, as the circuit court

10

determined, a concerned adult. Further, the recorded interview indicates that the respondent's answers to Bedford's questions were responsive.

¶ 28    Despite Eckert's testimony that individuals with the respondent's mental capacity would state that they understood something when they did not, the respondent here indicated to the detectives when he did not understand something. Moreover, he did not simply acquiesce to information supplied by the detectives but spoke up and corrected Bedford's description of the offense. For example, Bedford asked if the respondent was on his knees or on top of the victim and instead of agreeing or choosing one of the options Bedford set forth, the respondent indicated that he was in a push-up position.

¶ 29    Eckert's apparent opinion that no one with the respondent's mental capacity would be able to make an intelligent waiver is contradicted by established case law. See, *e.g.*, *W.C.*, 167 Ill. 2d at 328 (providing that "mental deficiency, of itself, does not render a statement unintelligent"). Moreover, Eckert never reviewed the recording of the respondent's interview. See *Daniels*, 391 Ill. App. 3d at 787-88 ("[T]he relative weight to be given an expert witness's opinion is 'measured by the reasons given for the conclusion and the factual details supporting it.' " (quoting *People v. Wilhoite*, 228 Ill. App. 3d 12, 20-21 (1991)); *People v. Woidtke*, 224 Ill. App. 3d 791, 804 (1992) ("The credibility and weight to be given psychiatric testimony is for the trier of fact to determine. The judge may reject all expert testimony and rely on lay testimony.").

¶ 30    Taking these facts into consideration, we cannot say the circuit court's findings that the respondent understood his rights and the consequences of waiving them were against the manifest weight of the evidence. Based on the foregoing, we conclude the respondent knowingly and intelligently waived his *Miranda* rights. See *W.C.*, 167 Ill. 2d at 313, 330-31, 334 (noting that the 13-year-old respondent never indicated he did not understand his rights, responded

11

affirmatively when asked if he understood, and "his demeanor and communication skills conveyed that he understood the warnings" and concluding that the respondent knowingly and intelligently waived his *Miranda* rights despite testimony that his IQ was 47 or 48, which was the chronological age equivalent to a six- to seven-year old, and that he would not be able to understand his rights or the consequences of waiving them).

¶ 31    To the extent the respondent is arguing his statements were otherwise involuntary, we note that the respondent's mother, a concerned adult, was present, the interview lasted less than 30 minutes, there were no allegations that the interview was illegal, there was no physical or mental abuse by the detectives, the detectives questioned the respondent in a calm manner, the detectives never threatened the respondent or raised their voices, there were no promises of leniency, and the respondent was 17 years old. Thus, we conclude that there is no indication that the respondent's will was overborne and therefore, the confession was voluntary.

¶ 32    The respondent also argues that per section 5-401.5(a-5)(1) of the Act his statements to the detectives were inadmissible because they did not read him the required statement of rights "continuously *** in its entirety and without stopping for purposes of a response from the minor or verifying comprehension." 705 ILCS 405/5-401.5(a-5)(1) (West 2018). However, the respondent raises this argument for the first time on appeal and it is therefore forfeited. See *People v. Hoskins*, 101 Ill. 2d 209, 219 (1984) ("[W]here a party raises a question for the first time on appeal it is considered waived and it may not be considered by the reviewing court."). Regardless, subsection (f) provides that any statements may still be admissible if the State shows by a preponderance of the evidence that they were voluntary given and reliable. See 705 ILCS 405/5-401.5(f) (West 2018). We have already concluded that the respondent's statements were voluntary. We also determine that the statements were reliable as they were corroborated by and

12

consistent with the evidence presented at the discharge hearing. Specifically, Dennis testified that he saw the respondent on top of the victim and that the respondent was pulling up his pants as he got off of the victim. Additionally, the physician's assistant testified that he examined the victim and made observations consistent with penetration. Further, during the motion to suppress hearing, Eckert testified that the respondent would be capable of providing factual information as to what happened.

¶ 33    Because the respondent's *Miranda* waiver was knowing and intelligent, his statements were voluntary, and the statements were not otherwise inadmissible pursuant to section 5-401.5(a-5)(1) of the Act, we conclude the circuit court properly denied the respondent's motion to suppress.

¶ 34                                    III. CONCLUSION

¶ 35    The judgment of the circuit court of Henry County is affirmed.

¶ 36    Affirmed.